

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-27-2008

# USA v. Ozcelik

Precedential or Non-Precedential: Precedential

Docket No. 06-4245

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Ozcelik" (2008). *2008 Decisions.* Paper 1088.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1088

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 06-4245

———


UNITED STATES OF AMERICA

v.

HAKAN OZCELIK
a/k/a Hakan Askin

Hakan Ozcelik,
                    Appellant


———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 05-cr-00722-1)
District Judge: Honorable Faith S. Hochberg


———

Argued February 12, 2008

Before: SLOVITER, SMITH, and STAPLETON, Circuit Judges

(Filed: May 27, 2008)
____

Adrienne U. Wisenberg
Solomon L. Wisenberg   (Argued)
Wisenberg & Wisenberg
Washington, D.C.  20036-0000

     Attorneys for Appellant

Sabrina G. Comizzoli   (Argued)
George S. Leone
Office of United States Attorney
Newark, N.J.  07102-0000

        Attorneys for Appellee

____

OPINION OF THE COURT

____


SLOVITER, <u>Circuit Judge</u>.

        This appeal raises, inter alia, an issue of first impression in this court, that is, what conduct constitutes shielding, harboring, and concealing an alien within the meaning of 8 U.S.C. § 1324.


**I.**
<u>Facts and Procedural History</u>


        In 1990, appellant Hakan Ozcelik, then age sixteen, came to the United States from Turkey as a stowaway on a merchant ship.[1]  Thereafter, Ozcelik earned his GED and a college degree in criminal justice, and worked at various jobs.  He obtained legal American citizenship and on December 15, 2003, he began working as a Customs and Border Protection Officer in the Department of Homeland Security ("DHS").  He worked principally in Port Elizabeth, New Jersey inspecting cargo on cruise vessels, but also occasionally worked at Newark Airport inspecting individual passengers.

        Tunc Tuncer, the government's principal witness, is a Turkish citizen who came to the United States on an F-1 student

---

        [1]  Ozcelik went by the name of Askin at one time, but changed his name for family reasons.

visa to participate in a master's degree program at Columbia University. When Tuncer failed to meet required academic standards, Columbia refused him readmission, thereby subjecting him to deportation for being "out of status." App. at 352.

Shortly thereafter, Tuncer discussed his immigration issue with his friend, Uzgar Madik, who was the President of the Intercollegiate Turkish Students Society. Madik phoned Ozcelik, who Madik said might be able to help, and put Tuncer on the phone. The two had a short conversation. Tuncer called Ozcelik the next day to provide the information Ozcelik had requested and Ozcelik said he would see what he could do. Ozcelik called Tuncer back the following day, stating that Tuncer's case was "doable" or "easy" and that all Tuncer had to do was pay Ozcelik $2,300. App. at 220. Ozcelik told Tuncer the money had nothing to do with him, but that it was for two of his friends in the Immigration and Naturalization Service ("INS")[2] who were going to change some dates in the system for Tuncer's visa. Tuncer testified that Ozcelik told him he had "done this for another girl in the past recently" and would be happy to help Tuncer with his problem. App. at 225. Tuncer stated that he did not have the money and would call Ozcelik when he obtained it. Within the next week or two, Ozcelik called Tuncer several times asking about the money, but Tuncer said he did not have it and did not know when he could get it.

On March 14, 2005, Glenn Bartley, an Immigration and Customs Enforcement ("ICE") agent, visited Tuncer and told him he was "out of status." At a second meeting the next day Bartley administratively arrested Tuncer but did not detain him. At that meeting, the two discussed the possibility of Bartley receiving information from Tuncer about Ozcelik.

---

[2] As of March 2003, INS became United States Citizenship and Immigration Services, an agency within the Department of Homeland Security. We use the term "INS" or "Immigration" throughout because that is the term used in the record.

From March 18, 2005 until May 24, 2005, Tuncer initiated several phone conversations at the direction of law enforcement who recorded the conversations. Tuncer told Ozcelik that his immigration problem was "still continuing." App. at 970. Ozcelik reiterated that Tuncer would have to pay at least $2,000. In a subsequent recorded conversation, Tuncer asked Ozcelik if $2,000 would be enough. Ozcelik responded: "No it can't. There is 2000 and than [sic] there is 300 for the fee, they will give those, they will do the thing for you, they will do the thing from the inside." App. at 979. Ozcelik never told Tuncer the names of the two friends, but he continually stated that the money was for them.

Ozcelik and Tuncer arranged a meeting at the New Port Mall on March 24, 2005, so that Tuncer could pay Ozcelik the $2,300 fee and provide him with a copy of his immigration paperwork. At that meeting, Ozcelik took the money and told Tuncer that it would take at least three months for anything to happen. Following the meeting, Tuncer and Ozcelik had one more recorded phone conversation in which Tuncer asked whether there was "anything new" and Ozcelik said that he had made the necessary contacts and that Tuncer would be the one "receiving news." App. at 999.

As a result of those conversations and the controlled meeting between Tuncer and Ozcelik, a federal grand jury charged Ozcelik in a two-count indictment. Count One of the indictment charged Ozcelik with seeking and accepting a bribe in return for being influenced in the performance of official acts and being induced to do or omit acts in violation of official duties, in violation of 18 U.S.C. § 201(b)(2). Count Two charged Ozcelik with attempting to conceal, harbor, and shield from detection an illegal alien, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii).

The jury trial began on March 14, 2006. When the government rested, Ozcelik reserved his right to move for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Ozcelik thereafter presented evidence, including testifying on his own behalf. The jury convicted

Ozcelik on both counts. The District Court denied Ozcelik's renewed motion for judgment of acquittal.

With regard to the bribery conviction, the District Court held that there was ample evidence that Ozcelik solicited and accepted $2,300 from Tuncer. The Court also stated that there was substantial evidence that Ozcelik contemplated passing on some or all of the $2,300 to other immigration officials for the purpose of their taking official action to assist Tuncer. The Court further held that a reasonable juror could infer corrupt intent in soliciting the bribe because there was substantial evidence of Ozcelik's consciousness of wrongdoing. With respect to the conviction for shielding/harboring an alien, the Court held that there was sufficient evidence that Ozcelik gave Tuncer multiple instructions to conceal his activities in order to avoid detection by immigration authorities. The Court characterized Ozcelik's conduct as "instructing Tuncer to hide from the immigration authorities," App. at 14, thereby constituting the crime of shielding.

Following a sentencing hearing, the District Court sentenced Ozcelik. On the bribery conviction, the Court imposed a two-level enhancement for obstruction of justice for Ozcelik's false trial testimony, resulting in an adjusted offense level of 16. With respect to the shielding conviction, the Court imposed a two-level enhancement because Ozcelik abused a position of trust, resulting in an adjusted offense level of 11. The District Court denied Ozcelik's request to group the two offenses pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 3D1.2. Instead, the Court followed the recommendation of the Probation Officer, who had calculated the offense level by applying the multiple-count adjustment pursuant to U.S.S.G. § 3D1.4, resulting in a total offense level of 17. With an offense level of 17 and a criminal history category of I, Ozcelik's Guidelines range was twenty-four to thirty months imprisonment. The Court sentenced Ozcelik to twenty-seven months imprisonment on each count, to be served concurrently.

Ozcelik appeals.[3]  He argues that the evidence was insufficient to sustain both the bribery and shielding convictions. He also argues that the Court erred in defining the term "official act" in its instructions to the jury.  Finally, Ozcelik contends that the Court erred by not grouping his offenses at sentencing.

## II.
### Sufficiency of Evidence on Count One - Bribery

It is black letter law that in order to convict a defendant the government must prove each element of a charged offense beyond a reasonable doubt.  See In re Winship, 397 U.S. 358, 364 (1970).  We apply a deferential standard in determining whether a jury's verdict rests on sufficient evidence.  Viewing the evidence in the light most favorable to the government, we will sustain a defendant's conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  United States v. Voight, 89 F.3d 1050, 1080 (3d Cir. 1996) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  An appellant raising a claim of insufficiency of the evidence bears a "very heavy burden."  United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998) (internal quotations omitted).

Although we believe that the issue of the sufficiency of evidence to prove bribery is a very close one, we cannot disregard that a jury convicted Ozcelik of bribery in violation of 18 U.S.C. § 201(b)(2).  That statute provides that whoever:

> being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for:
>
> > (A) being influenced in the performance of any official act;

---

[3]  We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

6

(B) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or

(C) being induced to do or omit to do any act in violation of the official duty of such official or person; . . .

shall be fined under this title . . . or imprisoned for not more than fifteen years, or both . . . .

18 U.S.C. § 201(b)(2). The government must prove that the public official took or sought the funds for one of the three purposes enumerated in subsections (A), (B), and (C) in the statute.

Under § 201(b)(2), there are three essential elements that must be met: (1) defendant must be a public official, (2) who directly or indirectly demanded, sought, received, accepted, or agreed to receive or accept anything of value personally or for any other person or entity, and (3) did so specifically for one of the three corrupt purposes set forth in subsections (A) through (C). See United States v. Orenuga, 430 F.3d 1158, 1166 (D.C. Cir. 2005). There is no question that Ozcelik met the first two elements: he is a public official and he received money from Tuncer.[4] The third element goes to Ozcelik's intent.

---

[4] Ozcelik testified at trial that he never received the money from Tuncer. However, Tuncer testified that he had given Ozcelik $2,300 at their meeting at the New Port Mall. ICE agents gave Tuncer the $2,300 in cash that he took to the meeting with Ozcelik. Although the agents could not see the money change hands from their surveillance positions, the agents patted down Tuncer when he returned to their vehicle following the exchange and verified that neither the cash nor the immigration documents he had taken to give to Ozcelik were on his person. In addition, the conversation during the exchange between Tuncer and Ozcelik was recorded. During that conversation Tuncer asked Ozcelik if he would "like to count" the money. App. at 995. Ozcelik responded, "No, no,

Thus the only disputed issue is whether the evidence is sufficient to prove that Ozcelik received Tuncer's money with a corrupt intent, that is, he did so for one of the three reasons prohibited by statute. The government argues that Ozcelik violated the statute under both subsection (A) and subsection (C), i.e., that he sought the bribe to be influenced in the performance of an official act and that he took the bribe contrary to his official duty to uphold the immigration law. It argues that Ozcelik's consciousness of wrongdoing is reflected by his consistent statements to Tuncer to conceal their arrangement.

Section 201(a)(3) defines "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3).

The government argues that Ozcelik was guilty under this statutory section "in two non-mutually exclusive ways." Appellee's Br. at 28. First, he had the corrupt intent to take official action directly by acting "in his capacity as a DHS employee [to agree] to take official action to request others in DHS for official aid for Tuncer," and, if need be, to intervene. Appellee's Br. at 28. "Second, Ozcelik, as a middleman, agreed to importune other Immigration officials to take official action to assist Tuncer." Appellee's Br. at 28. Both theories require us to consider what is the "official action" Ozcelik took to fall within the bribery statute.

On this record, the jury could find that Ozcelik asked other individuals within DHS to take official action on behalf of Tuncer; thus both theories blend together into one theory of aiding and abetting other unidentified Immigration officials to take official action to alter Tuncer's records. As the government

---

no. . . . I believe you . . . ." App. at 995. Any reasonable juror could have found that the second element had been met based upon the ample evidence adduced at trial.

stated at oral argument, there is only one piece of evidence to show that such Immigration officials even existed – Ozcelik's own statements to Tuncer that he had a friend within the INS who would undertake to alter Tuncer's visa status.

We view the issue before us in light of our obligation to "view the evidence in the light most favorable to the government and [to] sustain a jury's verdict if 'a reasonable jury believing the government's evidence could find beyond a reasonable doubt that the government proved all the elements of the offense[ ].'" United States v. Rosario, 118 F.3d 160, 163 (3d Cir. 1997) (quoting United States v. Salmon, 944 F.2d 1106, 1113 (3d Cir. 1991)). We must "defer to the jury's assessment of witness credibility" and recognize that "the government's proof need not exclude every possible hypothesis of innocence." United States v. Bala, 236 F.3d 87, 93-94 (2d Cir. 2000) (internal quotations and alterations omitted).

One who aids and abets another is as guilty of the underlying offense as the principal. United States v. Dixon, 658 F.2d 181, 191 (3d Cir. 1981) (holding that middleman who facilitated bribery of government official was liable as aider and abettor). To prove that Ozcelik aided and abetted another, the government must prove that the other, i.e., the principal (in this case the unnamed friend at INS), committed all of the elements of the offense. United States v. Cades, 495 F.2d 1166, 1167 (3d Cir. 1974); see also United States v. Nolan, 718 F.2d 589, 592 (3d Cir. 1983). Notably, the offense is committed when the official (here, the unnamed INS official) agrees to accept the bribe in exchange for promising to carry out one of the statutory prohibitions (i.e., the promise to alter Tuncer's visa); it is not necessary to actually perform the prohibited act. See Orenuga, 430 F.3d at 1166 (stating that "'acceptance of the bribe is the violation of the statute, not performance of the illegal promise'") (quoting United States v. Brewster, 408 U.S. 501, 526 (1972)).

The evidence at trial was as follows: Tuncer testified that Ozcelik told him that he would get other authorities at Immigration to change Tuncer's visa status so that he could remain in the country. During the March 23 recorded telephone

9

conversation, Oczelik said that "they will give those, they will do the thing for you, they will do the thing from the inside." App. at 979.[5] At the March 24 meeting, Ozcelik stated, "the only thing I know is that the person I know will do something for you from the INS." App. at 986. Later in the same conversation, Ozcelik said, "At least 3 months, 3 months will have to go by, because these kind of things have a certain way, it will be in the system, there are a lot of people in front of you in the system. He needs to do something within that system, do you understand what I mean?" App. at 987. In a later recorded telephone conversation on May 24, Tuncer asked for assurance that Ozcelik had spoken with his friend at the INS and that the friend had undertaken to help. Ozcelik was reluctant to talk about such matters by phone but did confirm that he had "contacted the people in question" for Tuncer and that Tuncer "should be the one receiving news." App. at 999.

In addition, Tuncer testified at trial that in one of the earlier, unrecorded telephone conversations, Ozcelik had told him that his case was "doable," i.e., "easy for him." App. at 220. Tuncer testified that Ozcelik had asked him for $2,300, and Tuncer asked what the money was for. Ozcelik replied that the money "was for two of his friends who worked . . . at INS and they were going to change some dates within the system for [Tuncer's] visa." App. at 221.

If the jury believed that evidence, it could reasonably have concluded that Ozcelik had a contact (or contacts) at INS whom he aided in taking a bribe to violate the contact's official duty. The evidence that the friend had undertaken to adjust Tuncer's visa status was Ozcelik's own statements to Tuncer that his friend was going to adjust the visa within the system for Tuncer. Although there is no evidence that the friend actually adjusted the visa status, there is evidence from which the jury could infer that the friend agreed to adjust the visa, and it was at

---

[5] The government and Ozcelik each submitted slightly different versions of the recorded transcripts. There is no substantive difference between the two.

10

that point that the crime of the principal was complete. Because there was sufficient evidence from which the jury could rationally conclude that Ozcelik had induced a friend at INS to alter Tuncer's status in exchange for a bribe, there was sufficient evidence to support Ozcelik's guilt on a theory of aiding and abetting.

Ozcelik argues that there is insufficient evidence because the government could not name a specific official whom Ozcelik aided and abetted and there is no evidence that such unnamed official actually adjusted the visa. Ozcelik raises an intriguing argument. We agree that it is possible that there was no "friend" at the INS and that Ozcelik was lying to Tuncer by telling him that his friend at the INS would adjust Tuncer's status, when, in reality, Ozcelik intended to keep the money without taking any action to adjust Tuncer's status. Indeed, the only evidence the government produced at trial that the unnamed friend at INS existed was Ozcelik's own statements to that effect. But we are not permitted to assess credibility. And as such, we cannot say as a matter of law that no reasonable juror could accept the government's theory premised upon Ozcelik's own statements.

Although we are concerned that the government could not, through its investigation, discover the identity of Ozcelik's acquaintance at INS, that concern does not warrant overturning Ozcelik's conviction. After all, Ozcelik's own words provide the missing link and he did accept the money Tuncer paid for the performance of the official act.

Ozcelik proffered an alternative view of the evidence, i.e., that he solicited the money to procure a lawyer named Sol Kodsi to assist Tuncer. Kodsi testified that Ozcelik had requested that he represent Tuncer and that he had told Ozcelik that Tuncer's case would probably cost $2000 plus $300 for the filing fee and mailings. Kodsi testified that if Tuncer brought him $2,300 he would "probably more than likely take his case." App. at 588. Kodsi also testified that he had made an appointment with Tuncer through Ozcelik for March 25, 2005.

The jury was free to reject Kodsi's testimony, particularly

11

in light of the absence of any evidence that Kodsi ever spoke to Tuncer or that Ozcelik ever communicated any information about Kodsi to Tuncer. Instead, Ozcelik's statements to Tuncer were always in terms of his INS contacts. For example, he stated that "they will do the thing for you, they will do the thing from the inside." App. at 979 (emphasis added). Moreover, although Kodsi testified he was a longtime friend of Ozcelik, Ozcelik had stated in one recorded conversation that he was "not very close" to the ones who would be helping Tuncer, App. at 991, thereby throwing into question the alleged discussion with Kodsi. Although Ozcelik may have given a viable explanation for the request for funds, we cannot say that it was unreasonable for the jury to reject it in favor of the government's theory.

Ozcelik argues that the District Court improperly charged the jury on the meaning of "official act" as used in § 201(b)(2). Because Ozcelik did not object to the jury instructions at trial, and indeed, made a joint request in favor of the very instruction at issue, we review for plain error. United States v. Wolfe, 245 F.3d 257, 260-61 (3d Cir. 2001). A "plain error" is one that affects substantial rights. Id. (citing United States v. Olano, 507 U.S. 725, 732 (1993)). An error affects "'substantial rights' if it was prejudicial in that it affected the outcome of the District Court proceedings." Id. at 261 (citing Olano, 507 U.S. at 733). It is the defendant's burden to establish that the error prejudiced the jury's verdict. Id. Still, "[e]ven if the defendant establishes the existence of plain error, Rule 52(b) leaves to the sound discretion of the Court of Appeals the decision whether to correct the error. While the Court of Appeals has the authority to order correction when these elements are met, it is not required to do so." Id.

The District Court charged the jury on the definition of "official act" as follows:

> An official act means any decision or act or any question or matter which at any time may be pending or which may by law be brought before any public official in his or her capacity or in his or her place of trust. The term quote, "official act," includes the decisions or actions generally

12

expected of a public official.  These decisions or actions do not need to be specifically described in any law, rule or job description to be considered an quote, "official act," end quote.  Official acts that violate an official duty also are not limited to those within the official's specific authority.

App. at 1149 (emphasis added).

The relevant statute defines "official act" as:

any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, <u>in such official's official capacity</u>, or in such official's place of trust or profit.

18 U.S.C. § 201(a)(3) (emphasis added).  The error, Ozcelik claims, is that the District Court improperly substituted the words "in his or her capacity" for the statutory language, "in such official's official capacity."  He argues that the substitution eliminated the requirement that he needed to take action in his official capacity and instead implied that he only had to take action in some unspecified capacity.

The government contends that the omission of the word "official" was the stenographer's error, and that at trial the Court read the instruction containing the word "official."  Indeed, the government filed a motion to correct the record in the District Court, arguing that in fact, the Court had used the word "official" before capacity when it charged the jury.  The Court concluded, based upon the testimony of the court stenographer, that there was a reasonable probability that there had been a mistake in the transcript.  In addition, the written copy of the instructions the Court gave the jurors contained the word "official" and the Court had no recollection of omitting the word "official."

We defer to the District Court's conclusion that it did read to the jury the word "official."  Moreover, the jurors had copies

of the instructions that contained the word "official." Ozcelik has not met his burden of showing that the alleged error substantially affected the outcome of the proceedings.

### III.
Sufficiency of Evidence on
Count Two - Shielding/Harboring/Concealing

In his motion for judgment of acquittal, Ozcelik argued that the government failed to prove that he attempted to conceal, harbor, or shield from detention an illegal alien. The District Court denied that motion, concluding that Ozcelik had taken substantial steps to conceal Tuncer because he told him to "stay low key for 5-6 months" and not to "go left and right a lot." App. at 14. Ozcelik raises the same issue on appeal, arguing that his conduct, i.e., telling Tuncer to keep a low profile and not draw attention to himself, and stating that it was good that he lived at a different address than that on file with the INS, does not constitute harboring, concealing, or shielding under 8 U.S.C. § 1324. The government responds that Ozcelik's general advice to Tuncer substantially facilitated Tuncer's remaining in the United States illegally, and therefore constitutes shielding, harboring, and concealing under § 1324.

The question of what conduct constitutes shielding, harboring, and concealing within the meaning of § 1324 is an issue of first impression in this court. The statute, 8 U.S.C. § 1324(a)(1)(A)(iii), provides, in relevant part:

> Any person who . . . knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation . . . shall be punished . . . .

Tuncer was an illegal alien in the United States. He testified at Ozcelik's trial that he had remained in the United States in violation of the terms of his student visa. In addition,

14

Ozcelik did not contest that he knew that Tuncer was an illegal alien. Indeed, at Ozcelik's trial Tuncer testified that he had told Ozcelik that he remained in the United States in violation of the terms of his student visa. Thus, the only issue on appeal is whether Ozcelik's conduct towards Tuncer constituted concealing, harboring, shielding, or attempting to conceal, harbor, or shield. It is an issue that has occupied the attention of several appellate courts.

The original 1907 version of the statute prohibited only the smuggling or unlawful bringing of aliens into the United States. See United States v. Lopez, 521 F.2d 437, 439 (2d Cir. 1975). In 1917, the statute was amended to add concealing or harboring as a crime, but no punishment attached to concealing or harboring, only to smuggling. Id. In United States v. Evans, 333 U.S. 483, 484, 488 (1948), the Supreme Court discussed the legislative history of a prior version of § 1324, then 8 U.S.C. § 144. The Court stated that "the section as originally enacted was limited to acts of smuggling. And there is some evidence in the legislative history that the addition of concealing or harboring was meant to be limited to those acts only when closely connected with bringing in or landing, so as to make a chain of offenses consisting of successive stages in the smuggling process." Id. at 488. But, the Court noted, the evidence was not conclusive regarding Congress' intent as to the construction of the then-current version of the statute; it could be construed to criminalize as a separate offense, distinct from smuggling, the act of harboring or concealing an alien remaining in the country illegally. Id. The 1917 version of the statute was at issue in Evans. Significantly, Congress amended the statute after the decision in Evans. The congressional debates focused on the necessity of a statutory prohibition for those who "wilfully and knowingly" conceal or harbor an illegal alien, such as those who provide shelter for aliens. Lopez, 521 F.2d at 440.

Congress amended the statute in 1952 by means of Public Law 283, which applied a penalty to shielding/harboring as well as to the act of smuggling. The relevant provisions of the 1952 statute provided: "Any person . . . who . . . willfully or knowingly conceals, harbors, or shields from detection, or

15

attempts to conceal, harbor, or shield from detection, in any place, including any building or any means or [sic] transportation . . . shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs . . . ." Act of Mar. 20, 1952, Pub. L. No. 82-283, 66 Stat. 26 (1952) (current version at 8 U.S.C. § 1324(a)(1)(A)(iii)). The legislative history suggested that Congress intended to strengthen the law in "preventing aliens from entering or remaining in the United States illegally." Id. (emphasis added).

The amended statute was considered by the Court of Appeals for the Second Circuit in Lopez, 521 F.2d at 437. In light of the amendment that court concluded that the statute was not limited to instances of harboring in connection with smuggling. Id. at 440-41. The court held that providing shelter, obtaining employment, providing transportation to and from work, and arranging sham marriages for illegal aliens was conduct tending to substantially facilitate the aliens' remaining in the United States illegally. Id. at 441. In a later decision, the Second Circuit announced the following test for determining what constitutes shielding, concealing, and harboring under 8 U.S.C. § 1324: "harboring, within the meaning of § 1324, encompasses conduct tending substantially to facilitate an alien's remaining in the United States illegally and to prevent government authorities from detecting his unlawful presence." United States v. Kim, 193 F.3d 567, 574 (2d Cir. 1999) (emphasis added); see also United States v. Cantu, 557 F.2d 1173, 1180 (5th Cir. 1977) (stating that proper test is whether charged conduct tended "substantially to facilitate an alien's remaining in the United States illegally") (quoting Lopez, 521 F.2d at 441).

Convictions under § 1324 generally involve defendants who provide illegal aliens with affirmative assistance, such as shelter, transportation, direction about how to obtain false documentation, or warnings about impending investigations. See generally id. at 1175-76, 1180; United States v. Acosta de Evans, 531 F.2d 428 (9th Cir. 1976); Lopez, 521 F.2d at 437. In contrast, we have found no cases in which a defendant has been

16

convicted under this statute for merely giving an alien advice to lay low and to stay away from the address on file with the INS, obvious information that any fugitive would know.

For example, in Kim, the defendant Kim ordered his employee, an illegal alien, to report falsely to the INS that he had been terminated from his job, and Kim required the employee to obtain false documentation for the purpose of misleading the INS. Kim, 193 F.3d at 575. The court held that Kim's conduct met the definition of harboring under 8 U.S.C. § 1324 because it tended substantially to facilitate the alien's remaining in the United States illegally. Id. In effect, Kim directed his alien-employee to obtain false documentation as a condition of retaining his employment and gave detailed direction about how to affirmatively mislead the INS. The instruction was specific and involved falsifying documents. Ozcelik's conduct here is not comparable. He merely passed along general information to Tuncer and made no suggestions regarding falsifying documents.

In another case illustrating the type of conduct that falls within the statute, United States v. Sanchez, 963 F.2d 152, 154-55 (8th Cir. 1992), the defendant Sanchez provided illegal aliens with apartments and immigration papers. The Court of Appeals agreed that this justified Sanchez's conviction for shielding, harboring, or concealing under § 1324. Id. at 155-56. In yet another decision, United States v. Varkonyi, 645 F.2d 453, 459 (5th Cir. 1981), the defendant forcibly interfered with INS agents to prevent the aliens' apprehension. In addition, the defendant provided both employment and lodging to the aliens and assisted at least one of them to escape from INS custody. Id.

It is true, as the government argues, that some activity short of providing shelter would violate the statute. In United States v. Rubio-Gonzalez, 674 F.2d 1067, 1069-70 (5th Cir. 1982), several INS agents undertook to investigate whether certain employees at a Texas work site were illegal aliens. Upon entering the work area, one agent stopped Rubio-Gonzalez and asked him for identification. The identification established that Rubio-Gonzalez was a legal resident. As the agents proceeded to look for other employees, Rubio-Gonzalez sped away on his

17

motorcycle to another part of the work site. He then began speaking loudly and making gestures towards the INS agents, telling two other individuals (later proven to be illegal aliens) that the immigration authorities were present. The two aliens then fled. Id. at 1070.

The Court of Appeals held that Rubio-Gonzalez's conduct in alerting the illegal aliens to flee from investigating INS officers constituted "shielding from detection" within the meaning of 8 U.S.C. § 1324.[6] Id. at 1072. The court reasoned that shielding does not imply "any requirement that a physical barrier of some kind be involved," nor does it imply that a trick or artifice be used. Id.

In Rubio-Gonzalez, there was an immediate threat to the illegal aliens, that is, the physical presence of the INS agents who intended to apprehend illegal aliens. Rubio-Gonzalez, who had knowledge of the imminence of the apprehension, actively sought out illegal aliens and alerted them. There was a close temporal proximity between the threat to the illegal aliens and the warnings the defendant undertook to spread. In addition, the defendant's conduct was an affirmative and active response to an impending threat.

In contrast, here there is no evidence that Ozcelik knew about any imminent threat to Tuncer's immigration status. Nor is there any evidence that Ozcelik actively attempted to intervene in or delay an impending immigration investigation.

We agree with the Fifth Circuit that the terms "shielding," "harboring," and "concealing" under § 1324 encompass conduct "tending to substantially facilitate an alien's remaining in the United States illegally" and to prevent government authorities from detecting the alien's unlawful presence. Id. at 1073. We

---

[6] Rubio-Gonzalez involved interpretation of an older version of the statute but the relevant language was almost identical. Compare 674 F.2d at 1069 n.1 (quoting 8 U.S.C. § 1324(a)(3)), with 8 U.S.C. § 1324(a)(1)(A)(iii).

18

also agree that shielding does not require the use of a physical barrier, artifice, or trick. Nonetheless, we must examine whether Ozcelik's conduct fits within the statutory language as construed by the other courts of appeals.

The government cites the following evidence as proof that Ozcelik tended to substantially facilitate Ozcelik's remaining in the United States. During their March 24 meeting, Ozcelik stated to Tuncer, "You are not going to get involved in anything for 3-5 months in order to keep your status. Go to your work and come back home in silence, cook your food, do that only." App. at 988. Ozcelik continued, "The most important thing is for you to not get involved in anything here, to not get involved in any activity." App. at 989. In a similar vein, Ozcelik said to Tuncer, "That's why I'm telling you to stay away from everything for 4-5 months. Stay away from everything. Are you going to your job? Go, then come back home." App. at 992.

Ozcelik also commented that "it is a good thing that you've changed your address. I mean your legal address is different. You are living with a friend here. Disappear, don't tell anyone what address you're staying at." App. at 992. Later, he said, "Stay away. Stay away from everything for 5-6 months. . . . Especially the address thing is very important." App. at 994. Ozcelik stated, "[A]s I said before stay low key for 5-6 months, because you do not have any rights." App. at 996. In a later recorded telephone conversation, Ozcelik said to Tuncer, "I told you, don't do anything, I mean don't go left and right a lot." App. at 999. This constitutes the totality of the evidence on which the government relies.

The government argues that because Ozcelik gave Tuncer many instructions, including telling Tuncer to hide, how to hide, and to use multiple addresses to avoid detection by the authorities, Ozcelik provided "counseling" that violates the statute. We disagree. Instead, we view Ozcelik's comments as general advice to, in effect, keep a low profile and not do anything illegal. Ozcelik suggested that Tuncer stay out of trouble. Telling an illegal alien to stay out of trouble does not

19

tend substantially to facilitate the alien remaining in the country; rather, it simply states an obvious proposition that anyone would know or could easily ascertain from almost any source. Moreover, Tuncer had already changed his address before he even spoke to Ozcelik. Ozcelik's comments about that fact, therefore, were irrelevant because Tuncer had already taken the action on his own accord. Holding Ozcelik criminally responsible for passing along general information to an illegal alien would effectively write the word "substantially" out of the test we have undertaken to apply. We decline to do so.

Considering the evidence in the light most favorable to the government we conclude that no reasonable juror could find that Ozcelik's conduct tended to substantially facilitate Tuncer's remaining in the United States illegally. We therefore reverse Ozcelik's conviction under 8 U.S.C. § 1324 (Count Two of the Indictment) and will remand for resentencing.

Because we reverse Ozcelik's conviction with respect to Count Two, the harboring charge, only one offense of conviction remains. Therefore, Ozcelik's contention that his two offenses of conviction should have been "grouped" for sentencing purposes is moot.

**IV.**
Conclusion

For the above-stated reasons, we will affirm the judgment of conviction in part and reverse in part. We will remand for resentencing.

20