OPINION OF THE COURT
FUENTES, Circuit Judge:
Richard Bolmer filed suit against the property managers of Connolly Properties, Inc., alleging that they conspired to harbor illegal aliens and to encourage or induce illegal aliens to reside in the United States in violation of federal law. As a result of the Property Managers’ conduct, Bolmer claims his apartment complex fell into disrepair, defects and violations were no longer fixed, common areas were rarely cleaned, and criminal activity went unreported. Thus, he says he suffered injury to his leasehold property. The District Court granted the Property Managers’ Motion to Dismiss, holding that Bolmer failed to state a claim upon which relief *244 could be granted, and he now appeals. For the reasons that follow, we will affirm.
I.
A.
Mr. Bolmer has resided in the Pingry Arms building in Plainfield, New Jersey since February 2004. At some point after he moved in, the apartment building came under the management of Connolly Properties.[1] Bolmer alleges that, after Connolly Properties began managing his building, the apartment complex fell into disrepair. Specifically, he claims that Connolly Properties provided inadequate heat; failed to repair locks, his air conditioner, and the roof; failed to regularly clean common areas; allowed the building to become infested with bugs and rodents; permitted overcrowding, flooding, and mold; and turned a blind eye to criminal activity on the premises.
Bolmer asserts that, no later than January 2006, the Property Managers developed a scheme wherein they actively sought out aliens lacking lawful immigration status as prospective tenants. They did so, he says, by hiring a Spanish-speaking leasing agent and directing her to handwrite flyers in Spanish to advertise vacancies. Bolmer claims that the Property Managers told the leasing agent to ask all Spanish-speaking prospective tenants whether they were in this country lawfully and to exempt any aliens not lawfully present from the normal requirements of presenting identification and submitting to commercial background screenings. According to Bolmer, the Property Managers specifically sought out these individuals as tenants because they believed that they were less likely to complain about poor housing conditions or to report housing code violations to the authorities. He maintains that, by renting a substantial number of apartments to aliens not lawfully present, the Property Managers were able to allow their buildings to deteriorate into “slum-like conditions” without offering their tenants any reduction in rent. Bolmer further asserts that the Property Managers segregated those tenants whom they believed to lack lawful immigration status into particular buildings “to avoid their detection by law enforcement and other officials.” Appellant’s Br. 16. He maintains that the Property Managers “acted on a belief that ‘mixing’ a largely Hispanic illegal alien tenant population among African-American citizen tenants would provoke disturbances and fights caused by animus between citizens and illegal aliens, and result in entry by law enforcement officer [sic] onto the premises to conduct investigations and arrests.” Id. at 17.
B.
Plaintiffs filed this suit in June 2008 and subsequently amended their complaint twice, filing their Second Amended Complaint in December 2008. In Count I, Bolmer alleged that the Property Managers violated the conspiracy provision of the Racketeer Influenced and Corrupt Organizations Act (“RICO”), 18 U.S.C. § 1962(d). Specifically, he claimed that the Property Managers entered into a conspiracy to engage in an “Illegal Alien Rental Scheme” by renting apartments to aliens not lawfully present under the theory that they were less likely to complain about their housing conditions (or to demand a rent reduction in light of those conditions). The alleged result of this conspiracy was to deny Bolmer and other lawful tenants the full value of their leasehold by enabling the Property *245 Managers to keep the apartment complex in poor condition without reducing rents.
The Property Managers filed a Motion to Dismiss Count I under Federal Rule of Civil Procedure 12(b)(6). The District Court granted their motion, dismissing Count I with prejudice and denying Bolmer’s Motion for Leave to File a Third Amended Complaint. The District Court held that Bolmer failed to allege the predicate act of harboring and that he therefore failed to state a RICO conspiracy claim upon which relief could be granted. Bolmer filed a Motion for Reconsideration, which the District Court denied. Bolmer then filed a motion for partial final judgment on the District Court’s April and September Orders, pursuant to Federal Rule of Civil Procedure 54(b), which the Court granted.
Bolmer now appeals the District Court’s decision.[2]
II.
We exercise plenary review over the District Court’s grant of defendants’ motion to dismiss. Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 83 (3d Cir.2011). “In reviewing a dismissal under Federal Rule of Civil Procedure 12(b)(6), ‘we accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff ” Id. at 84 (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n. 7 (3d Cir.2002)). A motion to dismiss pursuant to 12(b)(6) may be granted “only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiffs claims lack facial plausibility.” Id. (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Though a complaint “does not need detailed factual allegations, ... a formulaic recitation of the elements of a cause of action will not do.” Twombly, 550 U.S. at 555, 127 S.Ct. 1955.
On appeal, Bolmer argues that the District Court erred in finding that he failed to allege a pattern of racketeering activity. Bolmer argues that he adequately pled two RICO predicate acts. First, he asserts that the Property Managers violated 8 U.S.C. § 1324(a)(l)(A)(iii), which prohibits a person from “concealing], harbor[ing], or shielding] from detection, or attempting] to conceal, harbor, or shield from detection” an alien who has illegally entered or remained in the United States, “in any place, including any building or any means of transportation.” Second, Bolmer asserts that the Property Managers violated 8 U.S.C. § 1324(a)(l)(A)(iv), which prohibits a person from “encouraging] or inducing] an alien to ... reside in the United States, knowing or in reckless disregard of the fact that such ... residence is or will be in violation of law.” We address each of these arguments in turn.
A.
Under 8 U.S.C. § 1324(a)(l)(A)(iii) a person is criminally liable if she,
knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation.
*246 We first addressed the question of what conduct constitutes the crime of harboring in United States v. Ozcelik, 527 F.3d 88 (3d Cir.2008). In that case, Hakan Ozcelik was charged with harboring after he gave general advice to “stay low” to an individual whom he knew to be in the United States illegally. Ozcelik, 527 F.3d at 97. We reversed Ozcelik’s harboring conviction, holding that “the terms ‘shielding,’ ‘harboring,’ and ‘concealing’ under § 1324 encompass conduct ‘tending to substantially facilitate an alien’s remaining in the United States illegally’ and to prevent government authorities from detecting the alien’s unlawful presence.” Id. (quoting United States v. Rubio-Gonzalez, 674 F.2d 1067, 1073 (5th Cir.1982)). We added that “[h]olding Ozcelik criminally responsible for passing along general information to an illegal alien would effectively write the word ‘substantially’ out of the test we have undertaken to apply.” Id. at 101.
We have since reaffirmed our commitment to the test laid out in Ozcelik. See United States v. Cuevas-Reyes, 572 F.3d 119 (3d Cir.2009); United States v. Silveus, 542 F.3d 993, 1003 (3d Cir.2008) (noting that “cohabitation with [an alien lacking lawful immigration status], taken alone, does not constitute ‘harboring’ within the meaning of the statute”). Moreover, in Lozano v. City of Hazleton, we specifically noted that
“harboring” requires some act of obstruction that reduces the likelihood the government will discover the alien’s presence. It is highly unlikely that a landlord’s renting of an apartment to an alien lacking lawful immigration status could ever, without more, satisfy this definition of harboring. Renting an apartment in the normal course of business is not in and of itself conduct that prevents the government from detecting an alien’s presence.
Lozano v. City of Hazleton, 620 F.3d 170, 223 (3d Cir.2010), vacated on other grounds, City of Hazleton v. Lozano, — U.S. —, 131 S.Ct. 2958, 180 L.Ed.2d 243 (2011) (emphasis added).[3]
Thus, to the extent that they simply rented apartments to aliens not lawfully present, the Property Managers cannot be said to have committed the crime of harboring.
Bolmer argues that the Property Managers did “much more than merely rent[ ]” apartments to undocumented individuals in that they “set up a criminal scheme which (1) specifically targeted illegal aliens as prospective tenants ... and (2) which steered illegal aliens into certain properties for the express purpose of preventing authorities from detecting the presence of illegal aliens on their properties.” Appellant’s Br. 8. In support of his claim that this conduct constitutes harboring, Bolmer directs our attention to cases from our sister circuits that have found harboring violations. Indeed, other circuits (some of which have defined “harboring” more broadly than we have in Ozcelik and other cases) have found defendants to be guilty of harboring in a variety of situations. See, e.g., Edwards v. Prime Inc., 602 F.3d 1276 (11th Cir.2010) (holding that *247 defendants engaged in harboring where they knowingly employed undocumented individuals, provided them with false names and Social Security numbers, and paid them in cash); United States v. Xiang Hui Ye, 588 F.3d 411 (7th Cir.2009) (holding that defendant was guilty of harboring where he employed individuals he knew were undocumented, did not require them to fill out job applications, tax forms, or other employment documents, leased apartments for them, paid them in cash, advised them that they could purchase fake immigration documents in Chicago, and omitted them from state employment forms); United States v. Singh, 261 F.3d 530 (5th Cir.2001) (noting that defendant may have been guilty of harboring where he employed undocumented individuals in his convenience store and those individuals lived in a back room of the store); United States v. Sanchez, 927 F.2d 376, 379 (8th Cir.1991) (holding that defendant was guilty of harboring where she and her husband “met with illegal aliens; the aliens told Mr. Sanchez that they were illegal; Mr. Sanchez told the illegal aliens that he could provide immigration papers for them; Mr. Sanchez paid to rent an apartment for the illegal aliens; Mrs. Sanchez took the illegal aliens to an apartment paid for by Mr. Sanchez; and Mrs. Sanchez told an illegal alien that she would give him a paper that would permit him to work”).
These cases, however, all involved defendants who failed to make necessary state and federal employment-related disclosures, were involved in smuggling undocumented individuals into this country, attempted to warn undocumented individuals of the presence of law enforcement authorities, and/or provided specific assistance in obtaining false documents. Here, the Property Managers were not required to disclose their tenants’ identities or immigration status to federal or state authorities, nor did they bring their tenants into this country, offer them assistance in procuring false documents, impede a law enforcement investigation, or pay to rent apartments on their behalf so as to keep their names off of the leases. We do not know of any court of appeals that has held that knowingly renting an apartment to an alien lacking lawful immigration status constitutes harboring. Indeed, we believe that such a holding would be contrary to our prior opinion in Ozcelik, because such conduct does not constitute the type of “substantial facilitation” that we require to make out a harboring offense.
Moreover, even assuming we were to find that the Property Managers substantially facilitated such aliens remaining in the United States, the Ozcelik test also requires Bolmer to show that their conduct tended to “prevent government authorities from detecting the alien’s unlawful presence.” Ozcelik, 527 F.3d at 100. He has not alleged facts that show such conduct. The two specific acts that Bolmer suggests constituted “acts of obstruction” were 1) exempting aliens not lawfully present from background checks and 2) segregating .them into specific rental buildings. However, these actions did not actually hinder immigration authorities’ detection of undocumented tenants. First, landlords have no obligation to require background checks of their tenants, so the Property Managers did not evade any federal or state reporting requirements. Moreover, Bolmer did not allege that third party background check screeners could or would have determined rental applicants’ immigration status or that they would have passed such status information along to immigration authorities. Second, by grouping large numbers of undocumented individuals into specific apartment buildings, the Property Managers arguably made the undocumented population more *248 conspicuous, both to Bolmer and to the authorities. Bolmer noted that, “[b]efore CPI began managing the Pingry Arms property, mostly African-American and Caucasian tenants resided at the property. During CPI’s management of Pingry Arms, [he] ... observed the evolution of the tenants to majority Hispanic, and few speak English [sic].” Pl.’s SAC ¶¶ 70-71. He describes his building today as an “illegal alien slum,” id. ¶ 73, and it is clear that he found his allegedly undocumented alien neighbors to be more visible as they increased in number.
While Bolmer has plausibly asserted that the Property Managers sought to conceal their own violations of local housing code and of federal prohibitions against discrimination in housing, he has not shown that they did anything to prevent their undocumented residents from being apprehended by immigration authorities. Certainly, as in Ozcelik, the Property Managers were likely aware that some of their residents lacked lawful immigration status and did nothing to alert federal authorities to this fact. The picture Bolmer paints, however, is one of a company whose leadership cared little of what happened to its tenants so long as Connolly Properties received a steady stream of rental income from any source. Bolmer has alleged that the Property Managers engaged in a great deal of unsavory and possibly discriminatory behavior. However, he has not sufficiently alleged that their conduct “ ‘tend[ed] to substantially facilitate an alien’s remaining in the United States illegally’ and to prevent government authorities from detecting the alien’s unlawful presence.” Ozcelik, 527 F.3d at 100. Thus, the District Court properly dismissed his harboring claim.
B.
Bolmer also asserts that the Property Managers violated 8 U.S.C. § 1324(a)(l)(A)(iv), which penalizes a person who “encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law.” As described above, in order to make out a claim for harboring in our circuit, it must be shown that the alleged violator “substantially facilitated” an alien not lawfully present remaining in the United States. Similarly, we believe that encouragement or inducement must also be “substantial” to support a conviction under the statute. This means not just general advice (as the Ozcelik defendant provided) but some affirmative assistance that makes an alien lacking lawful immigration status more likely to enter or remain in the United States than she otherwise might have been. “Induce” is defined as “to move by persuasion or influence; to call forth or bring about by influence or stimulation; to cause the formation of; or to produce,” Merriam-Webster Online Dictionary, available at www.merriam-webster.com, and that word plainly refers to conduct that causes someone to do something that they might otherwise not do. Moreover, “[t]he ordinary and common sense meaning of ‘encourage’ implies an affirmative act that serves as a catalyst or trigger that drives, motivates, or spurs another individual to embark on a course of action that he might not have otherwise.” United States v. Lopez, 590 F.3d 1238, 1259 (11th Cir. 2009) (Barkett, J., dissenting). Thus, “encourage” is best defined as “ ‘[t]o instigate; to incite to action; to give courage to; to inspirit; to embolden; to raise confidence; to make confident.’ ” Id. (quoting Black’s Law Dictionary 620 (4th ed.1968)). These definitions demonstrate that the word “encourage,” in the context of this statute, also refers to conduct that causes someone *249 to do something that they otherwise might not do.
Indeed, reading the encouraging or inducing subsection of the statute too broadly risks rendering the remaining subsections of 8 U.S.C. § 1324(a)(1)(A) redundant or superfluous. Subsection (i) prohibits bringing an alien lacking lawful immigration status to the United States other than at a designated port of entry. Subsection (ii) prohibits transporting such an alien within the United States in furtherance of their illegal presence in this country. Finally, subsection (iii), which we have already discussed at length, prohibits harboring an alien not lawfully present. If we define “encourage” merely as “to help,” then the particular conduct that is prohibited in subsections (i)-(iii) is subsumed by the general prohibition against helping an undocumented person to “come to, enter, or reside in” the United States in subsection (iv). “It is a well known canon of statutory construction that courts should construe statutory language to avoid interpretations that would render any phrase superfluous.” United States v. Cooper, 396 F.3d 308, 312 (3d Cir.2005); see also Lopez, 590 F.3d at 1259 (“ ‘A basic premise of statutory construction is that a statute is to be interpreted so that no words shall be discarded as being meaningless, redundant, or mere surplusage.’ ” (quoting United States v. Canals-Jimenez, 943 F.2d 1284, 1287 (11th Cir.1991))). Accordingly, we read subsection (iv) as prohibiting a person from engaging in an affirmative act that substantially encourages or induces an alien lacking lawful immigration status to come to, enter, or reside in the United States where the undocumented person otherwise might not have done so. Thus, subsection (iv) has the distinct character of foreclosing the type of substantial assistance that will spur a person to commit a violation of immigration law where they otherwise might not have.
The Property Managers in this case did not engage in an affirmative act that served as a catalyst for aliens to reside in the United States in violation of immigration law when they might not have otherwise. Bolmer suggests that the Property Managers provided aliens not lawfully present with rental housing, which other companies would not do, thereby encouraging them to reside in the United States when they otherwise might not have. However, Bolmer did not allege that these aliens would not or could not have resided in the United States without renting apartments in Connolly Properties’ buildings. Nor, given the facts of this ease, would such an assertion have been facially plausible, as the motion to dismiss standard requires. See Warren General Hosp. v. Amgen, Inc., 643 F.3d 77, 83 (3d Cir.2011). Among other things, many aliens are eligible for federal public housing benefits even if they live in households in which some members are aliens not lawfully present. See Alison Siskin & Maggie McCarty, Congressional Research Service, Immigration: Noncitizen Eligibility for Needs-Based Housing Programs (2008). This suggests that aliens lacking lawful immigration status are able to reside in this country with or without the assistance of the Property Managers’ alleged rental scheme. Moreover, there is no legal requirement that apartment managers screen potential tenants based on immigration status, and in some places it is actually illegal to do so. See Note, “There Be No Shelter Here”: Anti-Immigrant Housing Ordinances and Comprehensive Reform, 20 Cornell J.L. & Pub. Pol’y 399, (2010) (“California, for example [has] enact[ed] legislation barring landlords from asking tenants their legal status.... New York City also has an ordinance prohibiting landlords from questioning tenants about their legal status or *250 discriminating against them based on alienage or citizenship.”). Thus, Bolmer cannot show that the Property Managers’ conduct incited aliens to remain in this country unlawfully when they otherwise might not have done so, and he therefore has not alleged that they engaged in conduct sufficient to constitute encouraging or inducing.
We recognize that some of our sister circuits have chosen to define “encouraging or inducing” more broadly than we do here. See Edwards, 602 F.3d at 1295 (affirming a conviction for encouraging or inducing where the defendants hired and actively sought out individuals known to be undocumented and also provided them with names and social security numbers to facilitate their illegal employment); Lopez, 590 F.3d at 1249-52 (defining “encouraging or inducing” to include the act of “helping” aliens come to, enter, or remain in the United States and upholding Lopez’s conviction for encouraging or inducing where he captained a boat to the Bahamas, refueled it, spent the night, picked up aliens who lacked lawful immigration status from a hotel, and then drove them toward the United States in the boat); United States v. Fujii, 301 F.3d 535, 540 (7th Cir.2002) (“To prove that Fujii ‘encouraged or induced’ the aliens, all that the government needed to establish was that Fujii knowingly helped or advised the aliens.”). Nevertheless, while setting a seemingly low bar (i.e. “to help”) these cases have found that encouraging or inducing occurred only where defendants were personally involved in bringing aliens lacking lawful immigration status into the United States. The defendant in Fujii for example, accompanied such aliens on their trip to the United States, while the Lopez defendant conveyed aliens toward the Untied States via boat. Thus, we are not convinced that these circuits would agree that giving any type of “help” to an alien not lawfully present, no matter how de minimis the assistance, constitutes the crime of encouraging or inducing.
Moreover, defining the conduct at issue in this case as encouraging or inducing runs the risk of criminalizing actions contemplated by federal law and undermining the federal system of immigration enforcement. Persons who currently lack lawful immigration status may nonetheless reside in the United States, often with the explicit knowledge or even permission of the federal government. See, e.g., 8 U.S.C. § 1158 (authorizing the grant of asylum to refugees who are fleeing persecution abroad); 8 U.S.C. § 1255(i) (allowing aliens to adjust their status to lawful permanent resident); 8 U.S.C. § 1229b(b) (providing relief from deportation to certain persons otherwise subject to removal); 8 C.F.R. § 244.2 (granting certain aliens temporary protected status); 8 C.F.R. § 274a.12(c)(8)-(11), (14) (defining categories of aliens lacking lawful immigration status who are eligible to receive an employment authorization document). We cannot imagine that Congress contemplated that our nation’s landlords (not to mention our hotel and motel operators, innkeepers, and others who are in the business of providing accommodations) would be tasked with making complex legal determinations about who is permitted to live in this country, much less that they would be criminalized for an error in so doing. Thus, we believe that our interpretation of the encouraging and inducing statute best comports with the larger scheme of federal immigration law.
III.
Bolmer also argues that the District Court abused its discretion by refusing to allow him to amend his complaint for a third time in order to plead additional *251 facts that would demonstrate that the Property Managers prevented their undocumented residents from being detected by law enforcement. He relies on Alston v. Parker, 363 F.3d 229 (3d Cir.2004), for the proposition that, “even when a plaintiff does not expressly seek leave to amend, ‘if a claim is vulnerable to a 12(b)(6) dismissal, the court must give the party an opportunity to amend its pleadings unless such amendment would be futile or the party has expressed his intent to stand on his pleadings.’ ” Appellant’s Br. 48 (quoting Alston, 363 F.3d at 236). Alston, however, was given no opportunity whatsoever to amend his complaint, while Bolmer amended his complaint twice. Alston, 363 F.3d at 234 n. 7. Moreover, Alston’s was a civil rights complaint. “In non-civil rights cases, the settled rule is that properly requesting leave to amend a complaint requires submitting a draft amended complaint.” Fletcher-Harlee Corp. v. Pote Concrete Contrs., Inc., 482 F.3d 247, 252-53 (3d Cir.2007). Bolmer never presented a draft of a third amended complaint to the District Court. This failure is fatal to his request.
Bolmer argues that he did inform the District Court of additional facts that he wished to allege. Although a district court is authorized to grant a plaintiff leave to amend a complaint when justice so requires, it is not compelled to do so when amendment would be futile. Shane v. Fauver, 213 F.3d 113, 115 (3d Cir.2000). Here, the District Court found that further amendment of the complaint would have been futile. Our independent review of the record confirms that the District Court did not abuse its discretion in denying Bolmer leave to amend his complaint a third time.
IV.
For the foregoing reasons, we will affirm the District Court’s dismissal of Bolmer’s claim.[4]

. The date when this change in management occurred is not revealed in the record.

. The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

. While the Supreme Court recently vacated Lozano and remanded it to this Court for further consideration in light of its opinion in Chamber of Commerce v. Whiting, — U.S. —, 131 S.Ct. 1968, 179 L.Ed.2d 1031 (2011), Lozano's reasoning regarding harboring still provides us with useful direction. Whiting dealt with the question of whether federal law preempts an Arizona state law that authorized the state to impose licensing sanctions on employers that hire undocumented individuals. 131 S.Ct. at 1974. Whiting did not address the question of what conduct constitutes harboring, nor did it disturb this Court’s reasoning on that point.

. Because it found that Bolmer did not allege facts sufficient to constitute the predicate acts of harboring or encouraging or inducing, the District Court did not reach the issue of whether Bolmer had standing to bring a RICO claim. Bolmer v. Connolly Properties, Inc., No. 08-2753, slip op. at 6 n. 2 (D.N.J. April 8, 2009). For the same reason, we also decline to address this issue.