**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-4541
_____

MARIBEL DELRIO-MOCCI; LINDA ELLIOT; ROBERT
BOLMER; CHARLSEY SHEPPARD

v.

CONNOLLY PROPERTIES INC; DAVID M. CONNOLLY;
DANA AYALA; DANIA MOLINA

ROBERT BOLMER,
            Appellant
_____

On Appeal from the District Court
for the District of New Jersey
(No. 2:08-cv-02753)
District Judge: Honorable William J. Martini
_____

Argued on October 5, 2011

Before: McKEE, <u>Chief Judge</u>, and FUENTES and
GREENBERG, <u>Circuit Judges</u>

1

(Opinion Filed: February 24, 2012)

Michael M. Hethmon
Garrett R. Roe            **(ARGUED)**
Immigration Reform Law Institute
25 Massachusetts Avenue, NW Ste. 335
Washington, DC 20001
        *Attorneys for Appellant*

Robert M. Palumbos        **(ARGUED)**
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103

Marco A. Gonzalez, Jr.
Duane Morris LLP
744 Broad Street, Suite 1200
Newark, NJ 07102

Juan Cartagena
Jose Perez
Foster Maer
Ghita Schwarz
LationJustice PRLDEF
99 Hudson Street, 14th Floor
New York, NY 10013

        *Attorneys for Amicus Curiae the Latin American
Coalition, Inc. – Appellee*

Edward Barocas
Jeanne LoCicero
Alexander Shalom
American Civil Liberties Union of New Jersey Foundation
P.O. Box 32159
Newark, NJ 07102

Lee Gelernt
Omar Jadwat
American Civil Liberties Union Foundation Immigrants'
Rights Project
125 Broad Street, 18th Floor
New York, NY 10004

Lori Nessel
Seton Hall Law School Center for Social Justice
One Newark Center
Newark, NJ 07102

Janice MacAvoy
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004

Eunice Lee, Esq.
1563 Massachusetts Avenue
Cambridge, MA 02138

      *Attorneys for Amici Curiae the New Jersey Institute for*
      *Social Justice, et al. – Appellee*

OPINION OF THE COURT

Fuentes, <u>Circuit Judge</u>:

Richard Bolmer filed suit against the property managers of Connolly Properties, Inc., alleging that they conspired to harbor illegal aliens and to encourage or induce illegal aliens to reside in the United States in violation of federal law. As a result of the Property Managers' conduct, Bolmer claims his apartment complex fell into disrepair, defects and violations were no longer fixed, common areas were rarely cleaned, and criminal activity went unreported. Thus, he says he suffered injury to his leasehold property. The District Court granted the Property Managers' Motion to Dismiss, holding that Bolmer failed to state a claim upon which relief could be granted, and he now appeals. For the reasons that follow, we will affirm.

**I.**

**A.**

Mr. Bolmer has resided in the Pingry Arms building in Plainfield, New Jersey since February 2004. At some point after he moved in, the apartment building came under the management of Connolly Properties.[1] Bolmer alleges that,

---

[1] The date when this change in management occurred is not revealed in the record.

after Connolly Properties began managing his building, the apartment complex fell into disrepair. Specifically, he claims that Connolly Properties provided inadequate heat; failed to repair locks, his air conditioner, and the roof; failed to regularly clean common areas; allowed the building to become infested with bugs and rodents; permitted overcrowding, flooding, and mold; and turned a blind eye to criminal activity on the premises.

Bolmer asserts that, no later than January 2006, the Property Managers developed a scheme wherein they actively sought out aliens lacking lawful immigration status as prospective tenants. They did so, he says, by hiring a Spanish-speaking leasing agent and directing her to handwrite flyers in Spanish to advertise vacancies. Bolmer claims that the Property Managers told the leasing agent to ask all Spanish-speaking prospective tenants whether they were in this country lawfully and to exempt any aliens not lawfully present from the normal requirements of presenting identification and submitting to commercial background screenings. According to Bolmer, the Property Managers specifically sought out these individuals as tenants because they believed that they were less likely to complain about poor housing conditions or to report housing code violations to the authorities. He maintains that, by renting a substantial number of apartments to aliens not lawfully present, the Property Managers were able to allow their buildings to deteriorate into "slum-like conditions" without offering their tenants any reduction in rent. Bolmer further asserts that the Property Managers segregated those tenants whom they believed to lack lawful immigration status into particular buildings "to avoid their detection by law enforcement and other officials." Appellant's Br. 16. He maintains that the

5

Property Managers "acted on a belief that 'mixing' a largely Hispanic illegal alien tenant population among African-American citizen tenants would provoke disturbances and fights caused by animus between citizens and illegal aliens, and result in entry by law enforcement officer [sic] onto the premises to conduct investigations and arrests." *Id*. at 17.

**B.**

Plaintiffs filed this suit in June 2008 and subsequently amended their complaint twice, filing their Second Amended Complaint in December 2008. In Count I, Bolmer alleged that the Property Managers violated the conspiracy provision of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). Specifically, he claimed that the Property Managers entered into a conspiracy to engage in an "Illegal Alien Rental Scheme" by renting apartments to aliens not lawfully present under the theory that they were less likely to complain about their housing conditions (or to demand a rent reduction in light of those conditions). The alleged result of this conspiracy was to deny Bolmer and other lawful tenants the full value of their leasehold by enabling the Property Managers to keep the apartment complex in poor condition without reducing rents.

The Property Managers filed a Motion to Dismiss Count I under Federal Rule of Civil Procedure 12(b)(6). The District Court granted their motion, dismissing Count I with prejudice and denying Bolmer's Motion for Leave to File a Third Amended Complaint. The District Court held that Bolmer failed to allege the predicate act of harboring and that he therefore failed to state a RICO conspiracy claim upon which relief could be granted. Bolmer filed a Motion for

6

Reconsideration, which the District Court denied. Bolmer then filed a motion for partial final judgment on the District Court's April and September Orders, pursuant to Federal Rule of Civil Procedure 54(b), which the Court granted.

Bolmer now appeals the District Court's decision.[2]

## II.

We exercise plenary review over the District Court's grant of defendants' motion to dismiss. *Warren Gen. Hosp. v. Amgen, Inc.*, 643 F.3d 77, 83 (3d Cir. 2011). "In reviewing a dismissal under Federal Rule of Civil Procedure 12(b)(6), 'we accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff.'" *Id.* at 84 (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). A motion to dismiss pursuant to 12(b)(6) may be granted "only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff's claims lack facial plausibility." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). Though a complaint "does not need detailed factual allegations, . . . a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

On appeal, Bolmer argues that the District Court erred in finding that he failed to allege a pattern of racketeering activity. Bolmer argues that he adequately pled two RICO

---

[2] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

predicate acts. First, he asserts that the Property Managers violated 8 U.S.C. § 1324(a)(1)(A)(iii), which prohibits a person from "conceal[ing], harbor[ing], or shield[ing] from detection, or attempt[ing] to conceal, harbor, or shield from detection" an alien who has illegally entered or remained in the United States, "in any place, including any building or any means of transportation." Second, Bolmer asserts that the Property Managers violated 8 U.S.C. § 1324(a)(1)(A)(iv), which prohibits a person from "encourag[ing] or induc[ing] an alien to . . . reside in the United States, knowing or in reckless disregard of the fact that such . . . residence is or will be in violation of law." We address each of these arguments in turn.

## A.

Under 8 U.S.C. § 1324(a)(1)(A)(iii) a person is criminally liable if she,

> knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or means of transportation.

We first addressed the question of what conduct constitutes the crime of harboring in *United States v. Ozcelik*, 527 F.3d 88 (3d Cir. 2008). In that case, Hakan Ozcelik was charged with harboring after he gave general advice to "stay low" to an individual whom he knew to be in the United States illegally. *Ozcelik*, 527 F.3d at 97. We reversed Ozcelik's

8

harboring conviction, holding that "the terms 'shielding,' 'harboring,' and 'concealing' under § 1324 encompass conduct 'tending to substantially facilitate an alien's remaining in the United States illegally' and to prevent government authorities from detecting the alien's unlawful presence." *Id.* (quoting *United States v. Rubino-Gonzalez*, 674 F.2d 1067, 1073 (5th Cir. 1982)). We added that "[h]olding Ozcelik criminally responsible for passing along general information to an illegal alien would effectively write the word 'substantially' out of the test we have undertaken to apply." *Id.* at 101.

We have since reaffirmed our commitment to the test laid out in *Ozcelik*. *See United States v. Cuevas-Reyes*, 572 F.3d 119 (3d Cir. 2009); *United States v. Silveus*, 542 F.3d 993, 1003 (3d Cir. 2008) (noting that "cohabitation with [an alien lacking lawful immigration status], taken alone, does not constitute 'harboring' within the meaning of the statute"). Moreover, in *Lozano v. City of Hazleton*, we specifically noted that

> "harboring" requires some act of obstruction that reduces the likelihood the government will discover the alien's presence. *It is highly unlikely that a landlord's renting of an apartment to an alien lacking lawful immigration status could ever, without more, satisfy this definition of harboring*. Renting an apartment in the normal course of business is not in and of itself conduct that prevents the government from detecting an alien's presence.

9

*Lozano v. City of Hazleton*, 620 F.3d 170, 223 (3d Cir. 2010), *vacated on other grounds*, *City of Hazleton v. Lozano*, 180 L. Ed. 2d 243 (2011) (emphasis added).[3]

Thus, to the extent that they simply rented apartments to aliens not lawfully present, the Property Managers cannot be said to have committed the crime of harboring.

Bolmer argues that the the Property Managers did "much more than merely rent[]" apartments to undocumented individuals in that they "set up a criminal scheme which (1) specifically targeted illegal aliens as prospective tenants . . . and (2) which steered illegal aliens into certain properties for the express purpose of preventing authorities from detecting the presence of illegal aliens on their properties." Appellant's Br. 8. In support of his claim that this conduct constitutes harboring, Bolmer directs our attention to cases from our sister circuits that have found harboring violations. Indeed, other circuits (some of which have defined "harboring" more broadly than we have in *Ozcelik* and other cases) have found defendants to be guilty of harboring in a variety of situations.

---

[3] While the Supreme Court recently vacated *Lozano* and remanded it to this Court for further consideration in light of its opinion in *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968 (2011), *Lozano*'s reasoning regarding harboring still provides us with useful direction. *Whiting* dealt with the question of whether federal law preempts an Arizona state law that authorized the state to impose licensing sanctions on employers that hire undocumented individuals. 2011 U.S. LEXIS at *12. *Whiting* did not address the question of what conduct constitutes harboring, nor did it disturb this Court's reasoning on that point.

*See, e.g.*, *Edwards v. Prime Inc.*, 602 F.3d 1276 (11th Cir. 2010) (holding that defendants engaged in harboring where they knowingly employed undocumented individuals, provided them with false names and Social Security numbers, and paid them in cash); *United States v. Xiang Hui Ye*, 588 F.3d 411 (7th Cir. 2009) (holding that defendant was guilty of harboring where he employed individuals he knew were undocumented, did not require them to fill out job applications, tax forms, or other employment documents, leased apartments for them, paid them in cash, advised them that they could purchase fake immigration documents in Chicago, and omitted them from state employment forms); *United States v. Singh*, 261 F.3d 530 (5th Cir. 2001) (noting that defendant may have been guilty of harboring where he employed undocumented individuals in his convenience store and those individuals lived in a back room of the store); *United States v. Sanchez*, 927 F.2d 376, 379 (8th Cir. 1991) (holding that defendant was guilty of harboring where she and her husband "met with illegal aliens; the aliens told Mr. Sanchez that they were illegal; Mr. Sanchez told the illegal aliens that he could provide immigration papers for them; Mr. Sanchez paid to rent an apartment for the illegal aliens; Mrs. Sanchez took the illegal aliens to an apartment paid for by Mr. Sanchez; and Mrs. Sanchez told an illegal alien that she would give him a paper that would permit him to work").

These cases, however, all involved defendants who failed to make necessary state and federal employment-related disclosures, were involved in smuggling undocumented individuals into this country, attempted to warn undocumented individuals of the presence of law enforcement authorities, and/or provided specific assistance in obtaining false documents. Here, the Property Managers

11

were not required to disclose their tenants' identities or immigration status to federal or state authorities, nor did they bring their tenants into this country, offer them assistance in procuring false documents, impede a law enforcement investigation, or pay to rent apartments on their behalf so as to keep their names off of the leases. We do not know of any court of appeals that has held that knowingly renting an apartment to an alien lacking lawful immigration status constitutes harboring. Indeed, we believe that such a holding would be contrary to our prior opinion in *Ozcelik*, because such conduct does not constitute the type of "substantial facilitation" that we require to make out a harboring offense.

Moreover, even assuming we were to find that the Property Managers substantially facilitated such aliens remaining in the United States, the *Ozcelik* test also requires Bolmer to show that their conduct tended to "prevent government authorities from detecting the alien's unlawful presence." *Ozcelik*, 527 F.3d at 100. He has not alleged facts that show such conduct. The two specific acts that Bolmer suggests constituted "acts of obstruction" were 1) exempting aliens not lawfully present from background checks and 2) segregating them into specific rental buildings. However, these actions did not actually hinder immigration authorities' detection of undocumented tenants. First, landlords have no obligation to require background checks of their tenants, so the Property Managers did not evade any federal or state reporting requirements. Moreover, Bolmer did not allege that third party background check screeners could or would have determined rental applicants' immigration status or that they would have passed such status information along to immigration authorities. Second, by grouping large numbers of undocumented individuals into specific apartment

12

buildings, the Property Managers arguably made the undocumented population more conspicuous, both to Bolmer and to the authorities. Bolmer noted that, "[b]efore CPI began managing the Pingry Arms property, mostly African-American and Caucasian tenants resided at the property. During CPI's management of Pingry Arms, [he] . . . observed the evolution of the tenants to majority Hispanic, and few speak English [sic]." Pl.'s SAC ¶¶ 70-71. He describes his building today as an "illegal alien slum," *id.* ¶ 73, and it is clear that he found his allegedly undocumented alien neighbors to be more visible as they increased in number.

While Bolmer has plausibly asserted that the Property Managers sought to conceal their *own* violations of local housing code and of federal prohibitions against discrimination in housing, he has not shown that they did anything to prevent their undocumented residents from being apprehended by immigration authorities. Certainly, as in *Ozcelik*, the Property Managers were likely aware that some of their residents lacked lawful immigration status and did nothing to alert federal authorities to this fact. The picture Bolmer paints, however, is one of a company whose leadership cared little of what happened to its tenants so long as Connolly Properties received a steady stream of rental income from any source. Bolmer has alleged that the Property Managers engaged in a great deal of unsavory and possibly discriminatory behavior. However, he has not sufficiently alleged that their conduct "'tend[ed] to substantially facilitate an alien's remaining in the United States illegally' and to prevent government authorities from detecting the alien's unlawful presence." *Ozcelik*, 527 F.3d at 100. Thus, the District Court properly dismissed his harboring claim.

13

**B.**

Bolmer also asserts that the Property Managers violated 8 U.S.C. § 1324(a)(1)(A)(iv), which penalizes a person who "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law." As described above, in order to make out a claim for harboring in our circuit, it must be shown that the alleged violator "substantially facilitated" an alien not lawfully present remaining in the United States. Similarly, we believe that encouragement or inducement must also be "substantial" to support a conviction under the statute. This means not just general advice (as the *Ozcelik* defendant provided) but some affirmative assistance that makes an alien lacking lawful immigration status more likely to enter or remain in the United States than she otherwise might have been. "Induce" is defined as "to move by persuasion or influence; to call forth or bring about by influence or stimulation; to cause the formation of; or to produce," MERRIAM-WEBSTER ONLINE DICTIONARY, *available at* www.merriam-webster.com, and that word plainly refers to conduct that causes someone to do something that they might otherwise not do. Moreover, "[t]he ordinary and common sense meaning of 'encourage' implies an affirmative act that serves as a catalyst or trigger that drives, motivates, or spurs another individual to embark on a course of action that he might not have otherwise." *United States v. Lopez*, 590 F.3d 1238, 1259 (11th Cir. 2009) (Barkett, J., dissenting). Thus, "encourage" is best defined as "'[t]o instigate; to incite to action; to give courage to; to inspirit; to embolden; to raise confidence; to make confident.'" *Id.* (quoting BLACK'S LAW DICTIONARY 620 (4th ed. 1968)). These definitions

14

demonstrate that the word "encourage," in the context of this statute, also refers to conduct that causes someone to do something that they otherwise might not do.

Indeed, reading the encouraging or inducing subsection of the statute too broadly risks rendering the remaining subsections of 8 U.S.C. § 1324(a)(1)(A) redundant or superfluous. Subsection (i) prohibits bringing an alien lacking lawful immigration status to the United States other than at a designated port of entry. Subsection (ii) prohibits transporting such an alien within the United States in furtherance of their illegal presence in this country. Finally, subsection (iii), which we have already discussed at length, prohibits harboring an alien not lawfully present. If we define "encourage" merely as "to help," then the particular conduct that is prohibited in subsections (i)-(iii) is subsumed by the general prohibition against helping an undocumented person to "come to, enter, or reside in" the United States in subsection (iv). "It is a well known canon of statutory construction that courts should construe statutory language to avoid interpretations that would render any phrase superfluous." *United States v. Cooper*, 396 F.3d 308, 312 (3d Cir. 2005); *see also Lopez*, 590 F.3d at 1259 ("'A basic premise of statutory construction is that a statute is to be interpreted so that no words shall be discarded as being meaningless, redundant, or mere surplusage.'" (quoting *United States v. Canals-Jimenez*, 943 F.2d 1284, 1287 (11th Cir. 1991))). Accordingly, we read subsection (iv) as prohibiting a person from engaging in an affirmative act that substantially encourages or induces an alien lacking lawful immigration status to come to, enter, or reside in the United States where the undocumented person otherwise might not have done so. Thus, subsection (iv) has the distinct character

15

of foreclosing the type of substantial assistance that will spur a person to commit a violation of immigration law where they otherwise might not have.

The Property Managers in this case did not engage in an affirmative act that served as a catalyst for aliens to reside in the United States in violation of immigration law when they might not have otherwise. Bolmer suggests that the Property Managers provided aliens not lawfully present with rental housing, which other companies would not do, thereby encouraging them to reside in the United States when they otherwise might not have. However, Bolmer did not allege that these aliens would not or could not have resided in the United States without renting apartments in Connolly Properties' buildings. Nor, given the facts of this case, would such an assertion have been facially plausible, as the motion to dismiss standard requires. *See Warren Hosp. v. Amgen, Inc.*, 643 F.3d 77, 83 (3d Cir. 2011). Among other things, many aliens are eligible for federal public housing benefits even if they live in households in which some members are aliens not lawfully present. *See* ALISON SISKIN & MAGGIE MCCARTY, CONGRESSIONAL RESEARCH SERVICE, IMMIGRATION: NONCITIZEN ELIGIBILITY FOR NEEDS-BASED HOUSING PROGRAMS (2008). This suggests that aliens lacking lawful immigration status are able to reside in this country with or without the assistance of the Property Managers' alleged rental scheme. Moreover, there is no legal requirement that apartment managers screen potential tenants based on immigration status, and in some places it is actually illegal to do so. *See* Note, *"There Be No Shelter Here": Anti-Immigrant Housing Ordinances and Comprehensive Reform*, 20 CORNELL J. L. & PUB. POL'Y 399, (2010) ("California, for example [has] enact[ed] legislation barring landlords from

16

asking tenants their legal status . . . .  New York City also has an ordinance prohibiting landlords from questioning tenants about their legal status or discriminating against them based on alienage or citizenship.").  Thus, Bolmer cannot show that the Property Managers' conduct incited aliens to remain in this country unlawfully when they otherwise might not have done so, and he therefore has not alleged that they engaged in conduct sufficient to constitute encouraging or inducing.

We recognize that some of our sister circuits have chosen to define "encouraging or inducing" more broadly than we do here.  *See Edwards*, 602 F.3d at 1295 (affirming a conviction for encouraging or inducing where the defendants hired and actively sought out individuals known to be undocumented and also provided them with names and social security numbers to facilitate their illegal employment); *Lopez*, 590 F.3d at 1249-52 (defining "encouraging or inducing" to include the act of "helping" aliens come to, enter, or remain in the United States and upholding Lopez's conviction for encouraging or inducing where he captained a boat to the Bahamas, refueled it, spent the night, picked up aliens who lacked lawful immigration status from a hotel, and then drove them toward the United States in the boat); *United States v. Fujii*, 301 F.3d 535, 540 (7th Cir. 2002) ("To prove that Fujii 'encouraged or induced' the aliens, all that the government needed to establish was that Fujii knowingly helped or advised the aliens.").  Nevertheless, while setting a seemingly low bar (i.e. "to help") these cases have found that encouraging or inducing occurred only where defendants were personally involved in bringing aliens lacking lawful immigration status into the United States.  The defendant in *Fujii*, for example, accompanied such aliens on their trip to the United States, while the *Lopez* defendant conveyed aliens

17

toward the Untied States via boat. Thus, we are not convinced that these circuits would agree that giving any type of "help" to an alien not lawfully present, no matter how *de minimis* the assistance, constitutes the crime of encouraging or inducing.

Moreover, defining the conduct at issue in this case as encouraging or inducing runs the risk of criminalizing actions contemplated by federal law and undermining the federal system of immigration enforcement. Persons who currently lack lawful immigration status may nonetheless reside in the United States, often with the explicit knowledge or even permission of the federal government. *See, e.g.*, 8 U.S.C. § 1158 (authorizing the grant of asylum to refugees who are fleeing persecution abroad); 8 U.S.C. § 1255(i) (allowing aliens to adjust their status to lawful permanent resident); 8 U.S.C. § 1229b(b) (providing relief from deportation to certain persons otherwise subject to removal); 8 C.F.R. § 244.2 (granting certain aliens temporary protected status); 8 C.F.R. § 274a.12(c)(8)-(11), (14) (defining categories of aliens lacking lawful immigration status who are eligible to receive an employment authorization document). We cannot imagine that Congress contemplated that our nation's landlords (not to mention our hotel and motel operators, innkeepers, and others who are in the business of providing accommodations) would be tasked with making complex legal determinations about who is permitted to live in this country, much less that they would be criminalized for an error in so doing. Thus, we believe that our interpretation of the encouraging and inducing statute best comports with the larger scheme of federal immigration law.

**III.**

18

Bolmer also argues that the District Court abused its discretion by refusing to allow him to amend his complaint for a third time in order to plead additional facts that would demonstrate that the Property Managers prevented their undocumented residents from being detected by law enforcement. He relies on *Alston v. Parker*, 363 F.3d 229 (3d Cir. 2004), for the proposition that, "even when a plaintiff does not expressly seek leave to amend, 'if a claim is vulnerable to a 12(b)(6) dismissal, the court must give the party an opportunity to amend its pleadings unless such amendment would be futile or the party has expressed his intent to stand on his pleadings.'" Appellant's Br. 48 (quoting *Alston*, 363 F.3d at 236). Alston, however, was given no opportunity whatsoever to amend his complaint, while Bolmer amended his complaint twice. *Alston*, 363 F.3d at 234 n.7. Moreover, Alston's was a civil rights complaint. "In non-civil rights cases, the settled rule is that properly requesting leave to amend a complaint requires submitting a draft amended complaint." *Fletcher-Harlee Corp. v. Pote Concrete Contrs., Inc.*, 482 F.3d 247, 252-53 (3d Cir. 2007). Bolmer never presented a draft of a third amended complaint to the District Court. This failure is fatal to his request.

Bolmer argues that he did inform the District Court of additional facts that he wished to allege. Although a district court is authorized to grant a plaintiff leave to amend a complaint when justice so requires, it is not compelled to do so when amendment would be futile. *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). Here, the District Court found that further amendment of the complaint would have been futile. Our independent review of the record confirms that the

19

District Court did not abuse its discretion in denying Bolmer leave to amend his complaint a third time.

**IV.**

For the foregoing reasons, we will affirm the District Court's dismissal of Bolmer's claim.[4]

---

[4] Because it found that Bolmer did not allege facts sufficient to constitute the predicate acts of harboring or encouraging or inducing, the District Court did not reach the issue of whether Bolmer had standing to bring a RICO claim. *Bolmer v. Connolly Properties, Inc.*, No. 08-2753, slip op. at 6 n.2 (D.N.J. April 8, 2009). For the same reason, we also decline to address this issue.

McKee, *Chief Judge*, concurring.[*]

Although I join my colleagues' analysis in its entirety, I write separately to highlight problems inherent in the text of the Racketeering Influenced Corrupt Organizations Act ("RICO") that are exemplified by this complaint. My concern arises from the fact that the treble damage provision of RICO spawns claims that are not at all related to the congressional purpose underlying that statute. Although many have recognized this problem, Congress has yet to address it. I nevertheless remain hopeful that continued calls for a legislative response to problems endemic in RICO's civil damage provision will one day alert Congress to the need to restrict the statute to the ills Congress thought it was addressing when it enacted this far reaching legislation.

**I.**

"RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985) (citation omitted).

---

[*] Judges Fuentes and Greenberg join Chief Judge McKee in this concurring opinion.

As is clear from my colleagues' explanation of this Amended Complaint, this case is at once a landlord-tenant dispute, a nuisance claim, and an alleged conspiracy to unlawfully rent apartments to undocumented persons. Those allegations are a far cry from what Congress intended when it added certain immigration violations to the already expansive list of predicate acts that would support a civil RICO claim.

Bolmer rests his RICO claim solely upon alleged violations of the Immigration and Nationality Act ("INA"). RICO was amended to define "racketeering activity" to include: "any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens) . . . ." 18 U.S.C. § 1961(1)(F) (2006). Section 274, which is now a RICO predicate offense, prohibits the bringing in, transportation, harboring, or employment of undocumented aliens. 8 U.S.C. § 1324 (2006). "[A] violation of § 274 of the INA is one of the infrequently used 'racketeering acts' identified in RICO § 1961(1)." Paul Batista, Civil RICO Practice Manual, § 3.15 (3d ed. Supp. 2010). As my colleagues explain, harboring

and encouraging or inducing—the alleged predicate acts here—are ill-defined under the INA itself.

It is, nevertheless, clear that Congress did extend RICO's predicate offenses to include specified immigration violations when it enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pub. L. No. 104-132, 110 Stat. 1214 (1996). In fact, § 433 of AEDPA is entitled: "Establishing Certain Alien Smuggling-Related Crimes as RICO-Predicate Offenses." Those "RICO Amendments" primarily focus on unlawful assistance to undocumented persons entering the country and those who help them evade law enforcement while here.[1]

---

[1] *See* AEDPA § 433.

> Establishing Certain Alien Smuggling-Related Crimes as RICO-Predicate Offenses: Section 1961(1) of title 18, United States Code, is amended—
> (1) by inserting "section 1028 (relating to fraud and related activity in connection with identification documents) if the act indictable under section 1028 was committed for the purpose of financial gain," before "section 1029";
> (2) by inserting "section 1542 (relating to false statement in application and use of passport) if the act indictable under section 1542 was committed for the purpose of financial gain, section 1543 (relating to forgery or false use of passport) if the act indictable under section 1543 was committed for the purpose of

3

Congressional concern with smuggling organizations is evident in the text, history, and purpose of the AEDPA amendments to RICO. The House Committee Report on AEDPA explains:

> The bill adds a number of immigration-related offenses as predicate offenses under the Racketeer Influenced Corrupt Organizations Act ("RICO"). The RICO statute is among the principal tools that Federal law enforcement officials use to combat organized crime. The amendment made by this section will extend the definition of "predicate acts" to enable them to use the statute *to combat alien smuggling organizations*.

H.R. Rep. No. 104-22 (1995), 1995 WL 56411 at *6 (emphasis added). Predicate acts established by AEDPA thus

---

financial gain, section 1544 (relating to misuse of passport) if the act indictable under section 1544 was committed for the purpose of financial gain, section 1546 (relating to fraud and misuse of visas, permits, and other documents) if the act indictable under section 1546 was committed for the purpose of financial gain, sections 1581–1588 (relating to peonage and slavery)," after "section 1513 (relating to retaliating against a witness, victim, or an informant),";
(3) by striking "or" before "(E)"; and
(4) by inserting before the period at the end the following: ", or (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain[.]".

4

reflect Congress' desire to include smuggling "organizations" within RICO's grasp. The amendments focus on the kind of activity such organizations engage in to smuggle aliens into the country. "The offenses added as RICO predicate act[s] are offenses involving fraud, false use, or forgery of passports, identification documents, or visas; offenses relating to peonage and slavery; offenses relating to retaliation against a witness, victim, or an information; and offenses relating to assisting illegal aliens to enter the country." *Id*. at *16.

Thus, including certain immigration violations as predicate acts under RICO "enable[d] federal law enforcement officials to use the RICO law to combat alien smuggling operations." *Id.* at *9. The action was necessary because "[o]rganized crime rings in this country, with ties to others abroad, have developed to prey upon illegal immigrants who want to come to the United States." 141 Cong. Rec. H1588 (daily ed. Feb. 10, 1995) (statement of Rep. McCollum); *see also Bobb v. Att'y. Gen.*, 458 F.3d 213, 221 (3d Cir. 2006) (noting that AEDPA targeted "[m]any of the crimes . . . committed by persons involved in organized immigration crime[,] . . . includ[ing] . . . alien smuggling . . .

5

[and] trafficking in immigration and other documents . . . .") (citing H.R. Rep. 104-22, at *7); *Sys. Mgmt., Inc., v. Loiselle*, 91 F. Supp. 2d 401, 408-09 (D. Mass. 2000) ("(Section 274 of the Immigration and Nationality Act) bears the title 'Bringing in and harboring certain aliens.' It thus seems targeted against individuals who smuggle, conceal, or transport illegal aliens into the United States.")).

## II.

In dressing this landlord-tenant dispute as a federal RICO claim and seeking treble damages, this plaintiff has joined countless others who have fashioned such claims out of disputes that have nothing whatever to do with subverting crime rings or criminal syndicates. Rather, we are here confronted with an everyday landlord-tenant dispute adorned as a racketeering claim complete with the obligatory treble damage request that is both the *sine qua non* and irresistible impulse of so many civil actions under RICO.

In *Sedima,* the Supreme Court warned: "in its private civil version, RICO is evolving into something quite different from the original conception of its enacters." 473 U.S. at 500

(citation omitted). This has occurred even though the congressional intent underlying RICO could not be clearer. Both the Act's title and the legislative history demonstrate that Congress passed the statute to target organized crime. *Id.* at 524 (Powell, J., dissenting); *see also H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 248 (1989) ("The occasion for Congress' action [in enacting RICO] was the perceived need to combat organized crime."). Congress therefore crafted the broad list of predicate offenses that trigger a RICO violation in order to create a weapon with sufficient flexibility to be effective in extricating society from the insidious tentacles of organized crime and all of its continually evolving mechanisms of infiltration and corruption. As we explained in *United States v. Bergrin*, 650 F.3d 257, 270-71 (3d Cir. 2011):

> Congress intended for RICO to apply to individuals who, through involvement in an enterprise, commit any combination of the many and diverse predicate acts, whether the usual organized crime-type offenses (*e.g.*, bribery, extortion, gambling), more violent crimes (*e.g.*, murder, kidnapping), or more niche crimes (*e.g.*, counterfeiting music or trafficking in illicit prescription drugs).

7

The broad array of crimes that Congress selected as RICO predicate offenses are thus intended to function as "hidden treasures—or buried landmines—" that can be exploited by creative counsel in an appropriate case.[2]

However, the very strength of RICO—its breadth—now diffuses its focus. RICO's treble damage provision has been seized upon to convert the statute into a hodgepodge of prohibitions that now function as a tripwire that offers the lure of treble recovery to all who can squeeze their claim into some combination of RICO's "predicate acts." The civil penalties in RICO have thus been transformed into a fulcrum that is used to pry treble damages out of causes of action originating in "divorce, trespass, legal and accounting malpractice, inheritance among family members, employment benefits and sexual harassment by a union." William H. Rehnquist, Chief Justice of the United States, Remarks of the Chief Justice, Address Before the Eleventh Seminar on the Administration of Justice (Apr. 7, 1989), *in* 21 St. Mary's L.J. 5, 11 (1989). In fact, "[m]ost of the civil suits filed under the statute have nothing to do with organized crime[;] [t]hey

---

[2] Batista, *supra*, § 3.15.

are garden-variety civil fraud cases of the type traditionally litigated in state courts." *Id.* at 9.

In *Sedima*, the Court mentioned in a footnote that an ABA Task Force on RICO had "found that of the 270 known civil RICO cases at the trial court level [at that time], 40% involved securities fraud, 37% common-law fraud in a commercial or business setting, and only 9% [involved] 'allegations of criminal activity of a type generally associated with professional criminals.' " 473 U.S. at 500 n.16. Similarly, "[a]nother survey of 132 published decisions found that 57 involved securities transactions and 38 [involved] commercial and contract disputes . . . ." *Id*. We can now add landlord-tenant disputes to the mix.

In the criminal arena, this proclivity for abuse is at least limited by prosecutorial discretion, the risk of losing credibility with jurors if the prosecution engages in "overkill" or overreaching, and the related risk of jury nullification. However, RICO's civil remedy is not restricted by any such

considerations.[3] Thus, it is not surprising that we are today faced with a claim that this landlord-tenant dispute is really a racketeering conspiracy that should entitle this tenant to treble damages under RICO.[4]

---

[3] *See* Rehnquist, Remarks, *supra,* at 10 ("[T]here is no such thing as prosecutorial discretion to limit the use of civil RICO by plaintiffs' attorneys.").

Even though one could argue that jury nullification plays a role in deterring abuse in the civil arena as well, common sense would suggest that the very different dynamics that are at work there make jury nullification or fear of overreaching far less important to determining how to structure a civil suit when jurors know "it's only money." Moreover, strategic considerations such as settlement posture may play a far more important role in deciding how to draft a civil complaint than concerns about overreaching or jury nullification.

[4] I do not suggest that landlord-tenant disputes and organized crime are necessarily mutually exclusive. The legislative history of RICO illustrates that organized crime is more than capable of injecting its poisonous proboscis into almost any "enterprise," including the business of renting property. *See e.g.*, *Swistock v. Jones*, 884 F.2d 755, 759 (3d Cir. 1989) (reversing district court dismissal of RICO claim of inducing plaintiffs to enter into a lease and make payments under the lease); *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 234 (S.D.N.Y. 2010) ("Defendants are correct that there is an aspect of this case that implicates individualized landlord-tenant disputes. But each landlord-tenant dispute is, according to Plaintiffs, more than just that; it is one of the hundreds, if not thousands, of pixels forming something larger, more uniform, and far more serious—a pattern of racketeering actionable under RICO. This is, in short, a RICO class action brought in federal district court, not a collection of landlord-tenant disputes . . . .").

Furthermore, creative counsel can hardly be faulted for resorting to this statute in representing clients as long as the

III.

Some courts have tried to address this problem by relying on such traditional concepts as prudential standing.[5]

statute remains as broad as it is now. *See Sedima*, 472 U.S. at 504 (Marshall, J., dissenting) ("[L]itigants, lured by the prospect of treble damages and attorney's fees, have a strong incentive to invoke RICO's provisions whenever they can allege in good faith" two predicate acts from the statute's substantial list of predicate offenses.); Rehnquist, Remarks, *supra*, at 12 ("RICO's treble damages provisions create a powerful incentive for attorneys to attempt to bring facts traditionally thought to establish other causes of action within the ambit of the statute."). Thus, I do not suggest counsel for this plaintiff has acted improperly in fashioning this claim as a RICO violation.

[5] Standing involves constitutional, prudential, and often statutory limitations on who may bring a claim in federal court. *Allen v. Wright*, 468 U.S. 737, 750-51 (1984); *see also The Pitt News v. Fisher*, 215 F.3d 354, 359 (3d Cir. 2000).

> The constitutional component [of standing], derived from the Art. III case or controversy requirement, requires a plaintiff to demonstrate that he or she suffered injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision.
>
> * * *
>
> Under certain circumstances, prudential, as opposed to constitutional, standing considerations limit a plaintiff's ability to bring suit. These prudential considerations are a set of judge-made rules forming an integral part of judicial self-government. The aim of this form of judicial self-governance is to determine

11

One such effort involved requiring plaintiffs to establish "RICO standing" just as antitrust standing is required of a plaintiff suing for an antitrust violation under the Clayton Act. *See Sedima*, 473 U.S. at 485. The Court of Appeals for the Second Circuit used that approach in *Sedima* in upholding the District Court's dismissal of the civil RICO action there. The Court of Appeals reasoned that a RICO plaintiff must allege a separate "RICO injury" "just as an antitrust plaintiff must allege an 'antitrust injury.'" *Id*. The Court of Appeals had imposed that requirement based on the legislative history and the strong congressional concern with providing additional tools against organized crime that lead to RICO's enactment. *Id.* at 494.[6]

---

whether the plaintiff is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.

*Conte Bros. Auto., Inc. v. Quaker State –Slick 50, Inc.*, 165 F.3d 221, 225 (3d Cir. 1998) (internal quotation marks and citations omitted).

[6] The Supreme Court noted that: "[i]n summarizing the bill [that became RICO] on the House floor, its sponsor described the treble damages provision as 'another example of the antitrust remedy being adapted for use against organized criminality.' " *Sedima*, 487 U.S. at 487 (citing 116 Cong. Rec. 35295 (1970)) (statement of Rep. Poff). The Senate did not object to the inclusion of treble damages because, as the Senate sponsor noted, it "would be 'a major new tool in

The Supreme Court rejected that reasoning. In reviewing the legislative history of RICO, the Court noted that the treble damages provision was added to "enhance the effectiveness of [the Act's prohibitions]." *Id*. at 487 (internal quotation marks and citations omitted). The Court observed that several courts had struggled to define "racketeering injury," but the Court concluded: "the difficulty of that task itself cautions against imposing such a requirement." *Id.* at 494 (footnote omitted). The Court explained:

> [g]iven that "racketeering activity" [under the Act] consists of no more and no less than commission of a predicate act, § 1961(1), we are initially doubtful about a requirement of a "racketeering injury" separate from the harm from the predicate acts. A reading of the statute belies any such requirement . . .. If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his[/her] business or property, the plaintiff has a claim under § 1964(c). There is no room in the statutory language for an additional, amorphous "racketeering injury" requirement.

extirpating the baneful influence of organized crime in our economic life.' " *Sedima*, 487 U.S. at 488 (citing 116 Cong. Rec. at 25190) (statement of Senator McClellan).

*Sedima*, 487 U.S. at 495 (footnote omitted).[7] Thus, the Court instructed, "RICO is to be read broadly." *Id.* at 497.

Yet, despite rejecting a requirement of "RICO standing," in *Sedima*, the Court nevertheless requires an injury sufficiently related to the alleged racketeering activity to justify allowing a treble damage claim to proceed under RICO. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006); *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992). The plaintiff in *Anza*, brought a RICO action against a business competitor alleging that the latter had filed fraudulent tax returns with the state in order to reduce the amount of sales tax accruing from sales. *Anza*, 547 U.S. at 454. With a reduced tax burden, the defendant could obtain a competitive advantage by selling its products at a lower price than the plaintiff who had to factor sales tax into the price it charged its customers. *Id.* The plaintiff alleged that the requisite predicate acts for RICO consisted of mail or wire

---

[7] The Court considered, but rejected any contention that Congress did not understand the implications of the treble damages provision. The Court reasoned that the provision was not enacted unnoticed and concluded that the statute's silence on the import of the provision was irrelevant because "congressional silence, no matter how 'clanging,' cannot override the words of the statute." *Sedima*, 473 U.S. at 495 n.13.

fraud depending on whether the fraudulent returns were mailed or filed electronically. *Id.*

The Supreme Court rejected the claim because the alleged injury was too remote from the alleged racketeering activity. *Id.* at 457-58. The direct victim of the predicate acts was the taxing authority, not the plaintiff. *Id.* Although plaintiff would not have suffered its injury "but for" the alleged racketeering activity, the defendant's lower prices proximately caused any business injury to plaintiff, not the alleged fraud. *Id.* at 458-59.

Although the Court's approach was consistent with a prudential standing analysis, the Court did not even mention standing in its discussion except to refer to the district court's reasoning. Rather, the Court relied on *Sedima* to explain that the "harm caused by predicate acts" must have a direct relationship to the alleged injury. *Id.* at 457 (citing *Sedima*, 473 U.S. at 497). The Court reiterated: "the essence of the [RICO] violation is the commission of those acts in connection with the conduct of an enterprise." *Id.* (internal quotation marks omitted). Although the injury in *Sedima* was established by alleging an injury "by reason of" the alleged racketeering activity, the injury in *Anza* was too attenuated

15

from that activity to justify a RICO claim even though the plaintiff would not have suffered injury "but for" the racketeering activity. *Anza*, 547 U.S. at 457-59.

The Court was also concerned that the plaintiff's lost sales could have resulted from any number of factors "other than [defendant's] alleged acts of fraud." *Id.* The Court reasoned that it would be extraordinarily difficult to properly apportion damages among the various factors that may have contributed to plaintiff's lost sales that were in addition to the defendant's lower prices. *Id.*

The analysis in *Anza* was foreshadowed by the Court's prior decision in *Holmes.* There, the Court had explained the practical and jurisprudential necessity of ensuring that alleged injuries were not too remote from the alleged racketeering acts to establish proximate cause for the plaintiff's injuries. 503 U.S. at 268-69. The analysis in *Anza* flowed directly from the need to establish causation. The majority decision in *Holmes* did not mention prudential standing either, and the Court only referred to "standing" tangentially. *See* 503 U.S. at 263, 264, 270.

Whether the analysis focuses on the nexus between the alleged injury and the alleged racketeering activity through

16

the lens of proximate cause or through the lens of prudential standing, the only limitation on treble damage claims appears to be ensuring that the claimed injury is not too remote from the alleged predicate acts.[8]  Thus, in *Allegheny General Hospital v. Philip Morris, Inc.,* 228 F.3d 429 (3d Cir. 2000), we focused our inquiry on the nexus between predicate acts and injury.  We there upheld the dismissal of various RICO claims brought by hospitals to recover unreimbursed medical expenses allegedly resulting from the defendant cigarette companies' fraudulent claims about tobacco use and their alleged manipulation of nicotine content of cigarettes.  *Id.* at 443-45.  We relied upon our earlier decision in the "closely analogous" case of *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912 (3d Cir. 1999).  In the latter case, union welfare funds had asserted similar claims under RICO.  228 F.3d at 435.  We explained in *Allegheny* that the plaintiffs' standing depended on "[w]hether . . . the alleged conspiracy proximately caused [the plaintiffs'] injuries." *Id.*

---

[8] "The Supreme Court has explained that the injury and causation requirements of § 1964(c) are aspects of RICO standing." *In re Sunrise Sec. Lit.*, 916 F.2d 874, 878-89 (3d Cir. 1990) (citations omitted).

More recently, in *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983 (2010), the Supreme Court specifically rejected a "but for" test of causation and reiterated that the RICO injury must be "by reason of" the alleged RICO violation. *Id.* at 989; a concept that leads to a proximate cause analysis. That decision also focused on proximate cause under RICO rather than on prudential standing. The Court explained that "proximate cause for RICO purposes . . . should be evaluated in light of its common-law foundations; proximate cause thus requires some direct relation between the injury asserted and the injurious conduct alleged. A link that is too remote, purely contingent, or indirec[t] is insufficient. *Id.* at 989 (internal quotation marks and citations omitted).[9]

---

[9] In *Hemi Group*, the City of New York brought a RICO claim against an out of state retailer who sold cigarettes over the internet to New York City residents without disclosing the names of the buyers to the taxing authorities in New York City as required by federal law. The taxing authorities would have used that information to collect the sales tax on the cigarettes that would otherwise go uncollected. The Court held that any economic injury the City may have suffered by the allegedly fraudulent conduct was not "by reason of" the alleged predicate acts because any failure to disclose was simply too remote to be the proximate cause of the City's injury. 130 S. Ct. at 988-89.

It nevertheless remains true under *Sedima* that all a plaintiff must allege to survive a motion to dismiss a claim for treble damages under RICO is that his/her injury occurred "by reason of" the alleged predicate acts. *See Sedima*, 473 U.S. at 497 ("Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts.") (footnote omitted). As I have explained, that hurdle is easily cleared in a multitude of actions that have nothing to do with organized crime in any of its many nefarious manifestations. For example, if the plaintiff here had been able to allege acts that amounted to actual "harboring" of aliens, his RICO claim would have survived a motion to dismiss even though there is absolutely nothing here to suggest a criminal organization is involved in the landlord's alleged neglect.

**IV.**

Yet, as the Supreme Court has explained, the misuse of the statute cannot be traced to any ambiguity in the statutory text that would allow for a judicial remedy by reading the statute in a manner that more closely reflects congressional intent. "The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute

what it means and means in a statute what it says there."
*BedRoc Ltd., v. United States*, 541 U.S. 176, 184 (2004)
(internal quotation marks and bracket omitted). "[T]he fact
that RICO has been applied in situations not expressly
anticipated by Congress does not demonstrate ambiguity. It
demonstrates breadth." *Sedima*, 473 U.S. at 499 (citation
omitted). Thus, it remains true that:

> private civil actions under the statute are being
> brought almost solely against [businesses not
> implicated in organized crime], rather than
> against the archetypal, intimidating mobster.
> Yet this defect—if defect it is—is inherent in
> the statute as written, and its correction must lie
> with Congress. It is not for the judiciary to
> eliminate the private action in situations where
> Congress has provided it simply because
> plaintiffs are not taking advantage of it in its
> more difficult applications.

*Id*. at 499-500 (footnote omitted).

Given the very legitimate and widespread concerns
about how the treble damage provision of RICO is pushing
RICO far beyond the parameters Congress intended, I join the
chorus expressing the need for Congress to revisit this very
important statute.[10] With reform, it can yet be honed into a

---

[10] *See, e.g.*, *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310,
328 (2d Cir. 2011) (Cabranes, J., dissenting) ("We encounter
here another chapter in the long saga of civil RICO and its
discontents. Since its enactment in 1970, the civil RICO

tool that will continue to be effective in remedying the havoc wreaked by organized crime while being less susceptible to being the remedy of choice whenever it appears that a defendant's transgressions can be recast as racketeering predicates.

Congress has, in fact, recognized that a problem exists with RICO in its current form. *See* RICO Amendments Act of 1991, H.R. Rep. No. 102-312 (1991), 1991 WL 243408 at *6-8; Rehnquist, Remarks, *supra*, at 12. Three possible reforms have been suggested: "[t]o amend the basic criminal law; to make civil RICO unavailable or more difficult to use

statute, Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968, has exasperated generations of federal judges and practitioners and generated a vast, and often skeptical, literature"); Rehnquist, Remarks, *supra*, at 13 ("I think that the time has arrived for Congress to enact amendments to civil RICO to limit its scope to the sort of wrongs that are connected to organized crime, or have some other reason for being in federal court"); William H. Rehnquist, *Get Rico Cases Out of My Courtroom*, Wall St. J., May 19, 1989, at A14; David B. Sentelle, *Civil RICO: The Judges' Perspective, and Some Notes on Practice for North Carolina Lawyers*, 12 Campbell L. Rev. 145, 148 (1990) ("[E]very single district judge with whom I have discussed the subject (and I'm talking in the dozens of district judges from across the country) echoes the entreaty expressed in the Chief Justice's title in The Wall Street Journal.")); *see also* Rehnquist, Remarks, *supra,* at 13 ("Each of the three branches—through court opinions, legislative proposals, or submissions to Congress—has recently expressed recognition of the need for reforming civil RICO.").

for numerous categories of offenses covered by criminal RICO; or to make changes to civil RICO which attempt to emulate the results attained by prosecutorial discretion in the criminal RICO area." *Id*. at *7.[11]

Although none of those approaches has yet been adopted into law, I continue to hope that Congress will address the problems that have become apparent in the statute as it is now written. It is for that reason alone that I write; nothing else needs to be added to the majority opinion.

---

[11] "Some individuals have even suggested that in view of RICO's treble damages provisions, the statute should be amended to allow for equally generous sanctions for frivolous claims." *Id*. at 12. I take no position on specific proposals, but encourage Congress to be as creative in its solutions as litigants have been in their use of the statute.