counsel as to whether the telegram and letter bearing date of February 27 constituted a counter proposition, and therefore the rejection of the option, or whether they simply amounted to an inquiry for better terms. It also becomes unimportant to determine whether the formal contract which was submitted was required to be signed by an executive officer, it not having been signed by any one on behalf of the defendant. Nor is the question of damages important.

For the reasons given, the judgment will be affirmed.

*Judgment affirmed.*

WILLIAMS and YOUNG, JJ., concur.

---

THE CHESAPEAKE & OHIO RY. CO. v. THE PITTSBURG STEEL FOUNDRY CO.

*Sales—Caveat emptor applies in absence of warranty—Warranty as to latent defects survives acceptance, when—Pennsylvania contract not within Ohio Sales Act, when—Section 8381 et seq., General Code—No express warranty against patent defects surviving inspection and acceptance, when—Construction by parties of ambiguous contract provisions, controls.*

1. In absence of warranty of quality of goods sold, rule of *caveat emptor* applies.
2. Under contract for manufacture and sale of castings, providing that castings which after test and acceptance showed injurious defects would be rejected, there was warranty as to latent defects, which survived acceptance.
3. Pennsylvania contract for sale of castings does not come within Uniform Sales Act of Ohio.

4. Under contract for sale of castings to be manufactured in accordance with certain specifications furnished by buyer, provision that castings should be free from defects, and those found with certain defects would be rejected, was not express warranty against patent defects, which would survive inspection and acceptance by buyer.

5. Where provisions in contract are ambiguous, construction placed on provisions by parties will control.

(Decided March 8, 1926.)

ERROR: Court of Appeals for Hamilton county.

*Messrs. Galvin & Tracy,* for plaintiff in error.

*Messrs. De Camp, Sutphin & Brumleve,* and *Messrs. J. M. Stoner & Sons,* for defendant in error.

HAMILTON, J.  Defendant in error, the Pittsburg Steel Foundry Company, brought suit in the court below against the Chesapeake & Ohio Railway Company, seeking to recover in an action for money on an account for steel castings furnished by the Foundry Company to the Railway Company.

It appears that under the orders given 738 steel frames were manufactured and delivered by the Foundry Company, and, after delivery, 339 were reported by the Railway Company to be defective, and were rejected by it.  The value of these rejected frames makes up the balance claimed to be due on the account, for which payment was refused by the Railway Company.

At the trial of the case the jury rendered a verdict in favor of the Foundry Company for the full amount of its claim, and judgment was entered on the verdict.  From that judgment, error is prosecuted to this court.

The castings were to be manufactured at the foundry of the Foundry Company in the city of Pittsburg. The castings were side frames for freight cars.

At the time of entering into the arrangement the Railway Company submitted certain specifications for the manufacture of the castings, which were made a part of the contract. The contract consists of eight orders, given by the Railway Company to the Foundry Company, and the specifications, the specifications being referred to in each of the orders given.

The form of the orders was substantially as follows:

"Please furnish the Chesapeake & Ohio Railway Company the following articles and render separate invoices in triplicate, with bill of lading and shipping receipt attached to each shipment, mailing same to director of purchases and stores of the Chesapeake & Ohio Railway Co., Richmond, Va.:

"Follow carefully the instructions on other side of this order.

"The following Bettendorf cast steel side frames, C. & O. specifications 71-A:

"75 CT-517 B/P-6667.
"75 CT-539 B/E-7517.    $38.00 each.

"F. O. B. works. Freight allowed to destination.

"Inspection to be made by Gulick-Henderson Company, 145 W. 36th Street, New York City, under direction of Mr. J. R. Gould, superintendent motive power. When ready for inspection notify this concern direct."

On the back of the order blank there were a number of "instructions," among them the following:

"Material not in accordance with specifications will be rejected, and held subject to shipper's orders, and must be replaced immediately unless otherwise instructed."

The specifications are referred to as 71-A and consist of 18 numbered paragraphs: Paragraph 1 provides for process; 2 for heat treatment; 3 for chemical composition; 4 for ladle analysis; 5 for check analysis; 6 for tension tests; 7 for alternative tests to destructions; 8 for test specimens; 9 for annealing lugs; 10 for number of tests; 11 for dimensions; 12 for weight; 13 for workmanship; 14 for patterns; 15 for finish; 16 for marking; 17 for inspection; and 18 for rejection.

Paragraph 15 of the specifications provides: "The castings shall be free from all defects. Castings shall not be painted before inspection. Castings rusted to any extent, or covered with any material to hide defects, shall be rejected.

"Any casting found with blow holes, cracks, low spots or thin sections filled with cement or like material will be rejected and shall not be further considered."

Section 17 of the specifications provides: "All castings subject to this specification will be inspected and tested either at place of manufacture or at destination, it being optional with the C. & O. Railway Co. as to place of inspection and testing. Castings which are inspected and tested at manufacturer's works and conform to this specification shall be shipped at once in the presence of the C. & O. Railway Co.'s inspector. Castings which have been rejected at destination will be returned to the manufacturer, who shall pay freight charges both ways.

"The inspector representing the C. & O. Railway Co. shall have free entry at all times while the castings are being made, to all parts of the manufacturer's works which concerns the manufacture of castings ordered."

Paragraph 18 provides: "Castings which do not meet the requirements of these specifications will be rejected, and the C. & O. pattern number shall be chipped off in the presence of the inspector.

"Castings which, subsequent to the above tests and their acceptance, either at manufacturer's works or at the mills, show injurious defects, will be rejected, and shall be replaced by the manufacturer at his own expense, including freight charges both ways on material rejected at destination."

Pursuant to this provision of the specifications, as to inspection, the orders of the Railway Company contained the following: "Inspection to be made by Gulick-Henderson Company, 145 W. 36th street, New York City, under direction of Mr. J. R. Gould, superintendent motive power. When ready for inspection notify this concern direct."

The orders were filled, commencing in July, 1922, and completed in February, 1923. All of the castings had been passed by the inspection of Gulick-Henderson Company at the factory. The first complaint made by the Railway Company was received in January, 1923, after something over 500 castings had been delivered, stating that a few of the castings had been rejected, without stating the reason therefor. The manufacture of the castings was continued by the Foundry Company, and deliveries made through January and February, following this letter of complaint.

In March and April additional complaints were made to the Foundry Company by letter, and the complaint was that there were some thin back walls and some cracks and broken boxes.

As heretofore stated, payment was refused on 339 frames. The Railway Company, defendant below, contended there and contends here that under the contract there was an express warranty of quality, and that this warranty survived their inspection and acceptance of the frames.

The Foundry Company, plaintiff below, contended there was no question of warranty involved in the case; that the contract provided that the castings were to be made according to the orders, plans, and specifications, and that when it manufactured castings according to the orders, plans, and specifications, and the frames passed the inspection of Gulick-Henderson Company, inspectors for the Railway Company, and the same were delivered to the Railway Company, the Foundry Company had completed its part of the contract; that the Railway Company had accepted the castings, and could not reject them thereafter, unless a latent defect subsequently developed, which could not have been ascertained at the time of the inspection.

The trial court charged the jury on this point as follows:

"You are instructed that under the terms of this contract the inspection and acceptance by the agents of the purchaser, or the acts of the agents, if done within the scope of their employment is binding on the principal, will preclude the defendant from any defects or in the quality of goods, except such defects as are of a

latent character; that is, such defects as are not visible or ascertainable upon the first inspection provided for under the contract.

"A latent defect may be defined as a hidden defect or blemish in the article sold, either known or unknown to the seller, but not apparent to the purchaser, and which could not be discovered by observation and inspection provided for in the contract.

"You will, therefore, determine from the evidence in this case how many of the castings provided for in the contract were delivered to defendant and accepted by the defendant, and from this number deduct any which you find had defects which were created or caused by the plaintiff and not due to any other causes, and which were not visible or ascertainable on the first inspection, and which defects constituted injurious defects, and award the plaintiff such an amount as," etc.

It is settled law that in the absence of a warranty the rule of *caveat emptor* applies. The warranty, if any exists, must be found in the specifications.

In passing, it may be well to state that in paragraph 18 is found the warranty as to latent defects, and the court was justified in charging as it did on the question of latent defects.

The question is: Was the trial court in error in its view of the law that the warranty in the contract did not survive the inspection and acceptance by the buyer, in so far as patent defects were concerned, but did survive as to latent defects?

The specifications relied upon by the Railway Company as constituting an express warranty of

patent defects is found in paragraph 15, which provides: "The castings shall be free from all defects. * * * Any casting found with blow holes, cracks, low spots, * * * will be rejected."

It is agreed that the contract is a Pennsylvania contract, and does not come within the Uniform Sales Act of Ohio, General Code, Sections 8381 to 8456. The rule as to express warranty in sales is laid down in the case of *Bowman Lumber Co.* v. *Anderson*, 70 Ohio St., 16, 70 N. E., 503, where the court holds in the syllabus:

"By an executory contract for the sale and delivery of chattels of a described grade or quality, the seller becomes bound to deliver goods of the character described, but, in the absence of express terms of warranty, no obligation is imposed upon him which survives the acceptance by the purchaser of an article delivered by the seller in good faith as in the performance of the contract if the acceptance is with full knowledge of all the conditions affecting the character and quality of the article."

Applying the rule to the instant case, it would seem that the Foundry Company was bound to manufacture and deliver the frames in accordance with the specifications supplied by the Railway Company. There was no express collateral warranty. The Railway Company furnished its own inspectors, who inspected, passed upon, and accepted the frames, and they accepted with full knowledge of all the conditions affecting the character and quality of the article.

Counsel in the brief for the Railway Company seek to distinguish the *Bowman Lumber Co.* case by the statement that the facts were entirely

different, and concerned certain kind of lumber ordered, and another kind shipped. Whatever the facts were, the rule was laid down as the common-law rule, which would apply in this case.

It must be understood that these goods were to be manufactured. They were to be manufactured in accordance with certain specifications furnished by the buyer. We are unable to deduce from this any express warranty which survives inspection and acceptance.

In the case of *Pierson* v. *Crooks*, 115 N. Y., 539, 22 N. E., 349, 12 Am. St. Rep., 831, it is stated: "The quality is a part of the description of the thing agreed to be sold, and the vendor is bound to furnish articles corresponding with the description. If he tenders articles of an inferior quality, the purchaser is not bound to accept them. But, if he does accept them, he is, in the absence of fraud, deemed to have assented that they correspond with the description, and is concluded from subsequently questioning it. This imposes upon the vendee the duty of inspection before acceptance, if he desires to save his rights in case the goods are of inferior quality. There is in such case no warranty of quality which survives acceptance, and the vendee cannot reject the goods after acceptance, or recover damages for inferior quality. He can do nothing inconsistent with the right of rejection, or do what is only consistent with acceptance and ownership, without precluding himself."

This quotation is cited with approval by our Supreme Court in the case of *Lumber Co.* v. *Anderson, supra.*

So, in the case under consideration, we have the specifications and plans designed and submitted by the vendee. The goods were to be manufactured in accordance therewith. It gave its orders, furnished the specifications, and designated the inspectors who were to approve the completed frames, and their inspectors did approve and accept the completed frames. The Railway Company had determined the process, the chemical composition, the tension strength, and in short all things necessary for the manufacture of the frames. They did protect themselves against latent defects.

Williston on Sales (2d Ed.), in Section 489, lays down the New York rule, prior to the Sales Act, to be that taking title to the goods indicates an assent to accept the goods in full satisfaction of the seller's obligations as to the quality of the goods. The author cites *Reed* v. *Randall*, 29 N. Y., 358, 86 Am. Dec., 305, as the leading case, followed by many other cases in many of the states.

A case very much in point and one entitled to great weight is the case of *Lestershire Lumber & Box Co.* v. *W. M. Ritter Lumber Co.*, 153 Fed., 573, 82 C. C. A., 527, from which we quote at some length. In that case the seller sold lumber to the buyer with the provision that "it is understood that this stock will be dry and in condition to work on arrival." The court said, on page 574, (82 C. C. A., 528):

"The defendant was entitled to have dry and workable lumber delivered; its condition in this regard was obvious, and could have been easily ascertained by defendant's inspectors. It is not

a case of secret imperfections or latent defects. With full opportunity to discover the condition of the lumber as to dryness, the defendant, having ascertained the facts, was under no obligation to keep the lumber if not up to the contract standard; but, having accepted and used it, the warranty, even assuming the language used to be in the nature of a warranty, was lost. It did not survive the acceptance.

"There is some conflict of authority upon this question, but we agree with the referee that the facts bring the controversy within the rule of *Reed* v. *Randall,* 29 N. Y., 358, 86 Am. Dec., 305. In that case the plaintiffs converted the property and months after delivery and acceptance brought an action to recover damages resulting from its being improperly cured and being in bad condition when delivered. The defendant had agreed to deliver the merchandise (tobacco) 'well cured and boxed, and in good condition.' The court held that in an executory contract of sale the right to recover damages because the goods do not correspond with the contract will not survive an acceptance and retention of the property with full opportunity to ascertain the defect, in the absence of notice to the vendor or proof of fraud.

"*Reed* v. *Randall* is a leading case and has been the law of New York for nearly half a century. Its application has by subsequent adjudications been somewhat circumscribed, but we think it cannot be distinguished on the facts from the present controversy. See, also, *Waeber* v. *Talbot,* 167 N. Y., 48, 60 N. E., 288, 82 Am. St. Rep., 712; *Gentilli* v. *Starace,* 133 N. Y., 140, 30 N. E., 660;

*Studer* v. *Bleistein,* 115 N. Y., 317, 22 N. E., 243, 5 L. R. A., 702.''

Moreover, it is not clear that the language used in the specifications, claimed to be a warranty, was intended to be such. It would be reasonable to construe it as merely descriptive of the goods to be manufactured. It expresses no more than the law would imply without words of express warranty. It is clear that the Railway Company did not treat the words as a warranty, nor rely upon them as such. That it did not do so is shown by the express words and details for inspection provided for in the specifications, and the careful manner in which that inspection was made by its inspectors, before delivery. It is the rule that where provisions in a contract are ambiguous the construction placed upon the provision by the parties will control. The action and conduct of the parties are entirely inconsistent with an intention to treat the words as an express warranty.

Our conclusion is that there was no express warranty in this case as to patent defects that survived the inspection and delivery of the castings, and the court of common pleas did not err in so charging the jury.

*Judgment affirmed.*

BUCHWALTER, P. J., and CUSHING, J., concur.