**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-2431
_____

UNITED STATES OF AMERICA

v.

JUAN FREDY HERNANDEZ-ZOZAYA,
also known as Jose
also known as Cocho
also known as Pancito,
                            Appellant

_____

Appeal from the United States District Court
for the District of New Jersey
(No. 2-15-cr-00080-001)
District Judge: Hon. Stanley R. Chesler
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
July 9, 2020

Before: McKEE, BIBAS, and FUENTES, *Circuit Judges*.

(Filed: September 10, 2020)
_____

OPINION[**]
_____

_____

[**] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

FUENTES, *Circuit Judge*.

Juan Fredy Hernandez-Zozaya appeals his conviction and sentence for two counts of conspiracy for his role in managing multiple brothels across New Jersey. Zozaya was sentenced to 78 months' imprisonment. For the following reasons, we will affirm.

## I. Background

In October 2018, Zozaya was charged with one count of conspiring to transport individuals for purposes of prostitution,[1] and one count of conspiracy to harbor aliens for financial gain.[2] Zozaya pleaded not guilty.

As alleged in the indictment, Zozaya operated a chain of brothels throughout New Jersey, alongside his girlfriend, Elizabeth Rojas. The majority of women employed as prostitutes were undocumented. Zozaya also hired undocumented individuals to work as house-operators in charge of opening and closing the brothels, taking payment from customers, and running errands for the prostitutes, and others to serve as lookouts to warn of police activity.

During the course of a five-day trial, the Government presented the testimony of three of Zozaya's brothel workers.

One of those workers, Jose Hernandez-Moreno, described how he came to the United States illegally and started working for Zozaya. Moreno informed Zozaya that he was undocumented, but Zozaya never asked for "working papers" or processed tax forms

---

[1] 18 U.S.C. § 2421; 18 U.S.C. § 371.
[2] 8 U.S.C. §§ 1324(a)(1)(A)(iii), (A)(v)(I), (B)(i).

for Moreno's employment.[3]  Moreno also testified that Zozaya rented eight houses as brothels under different names; made employment decisions, including pay; found women to work as prostitutes; transported workers to and from bus and train stations; and made rounds and daily calls to ensure operations were running smoothly, and to collect cash payments from customers.

Two former prostitutes also testified and corroborated Moreno's account of brothel operations.  Cristina Suerro Guerrero testified that she began working for Zozaya sometime after arriving in the United States illegally from the Dominican Republic. While working for Zozaya, Guerrero lived in Pennsylvania and New York, and traveled to the brothels in New Jersey.  On one occasion, Zozaya transported Guerrero from a train station in Trenton to one of the brothels.  Guerrero also explained that Zozaya knew she lived out-of-state, and that he never asked for her "working papers" or identification, never provided her with tax forms, and paid her in cash.

Nashielly Salinas Pacheco testified that after being trafficked across the border from Mexico, she worked for Zozaya while living in Queens, New York.  On at least one occasion, she traveled by bus from New York to New Jersey, and one of Zozaya's workers picked her up from the station and drove her to a brothel.  Again, Zozaya never asked to see Pacheco's working papers, and never gave her any tax forms.  Pacheco also testified that when Zozaya or Roja scheduled her shifts, it was understood that she could not leave her assigned brothel without permission.  She explained that this was because

---

[3] App. 379.

"it was a brothel and there are neighbors and what we were doing is not legal," and she knew if she got caught "[law enforcement] would put me in jail for prostitution and later deport me."[4]

The Government also called two law enforcement witnesses who testified about arrests made and evidence seized during the execution of search warrants at the brothels. As relevant, Special Agent Christopher Iatoro from Homeland Security testified that law enforcement encountered approximately 30 people on the day the brothels were searched, the majority of whom were illegal aliens.

The jury convicted Zozaya on both counts. At sentencing, the District Court rejected Zozaya's objection to a six-level specific offense characteristic enhancement under Guidelines § 2L1.1(b)(2)(B), based on its finding that the offense involved harboring between 25 to 99 illegal aliens.[5] The District Court sentenced Zozaya to concurrent 78-month terms of imprisonment on each count. Zozaya's timely appeal followed.

## II.    Discussion

Zozaya raises four issues on appeal.[6] As to Count I, he argues that the evidence at trial was insufficient to support a conviction. As to Count II, he argues (i) the District Court's jury instruction defining harboring was erroneous; (ii) there was insufficient

---

[4] App. 461-62.

[5] U.S. Sentencing Guidelines Manual § 2L1.1(b)(2)(B) (U.S. Sentencing Comm'n 2018) (hereinafter, "U.S.S.G.").

[6] The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.

4

evidence to support a conviction; and (iii) there was insufficient evidence to support a sentencing enhancement. We address each in turn.

### A. Conspiracy to transport women interstate for prostitution

First, Zozaya argues that there was insufficient evidence for the jury to find that he conspired to transport women across state lines for prostitution. He contends that the action of transporting prostitutes after they arrived in New Jersey does not involve the transportation of a person in interstate commerce because the prostitutes arranged and paid for their own transportation from out-of-state. We disagree.[7]

Section 2421(a) requires proof that the defendant (1) knowingly transported a person across state lines; and (2) transported the person with the intent that such person engage in prostitution.[8] As the District Court properly instructed the jury, without objection from defense counsel, "transportation can be found when someone arranges the transportation of that person or when someone provides a prostitution job and coordinates and prearranges the date and time on which that person would travel across state lines to engage in prostitution."[9]

---

[7] We exercise plenary review over the District Court's denial of Zozaya's motion for judgment of acquittal based on sufficiency of the evidence. *United States v. Repak*, 852 F.3d 230, 250 (3d Cir. 2017). In doing so, "[w]e review 'the evidence in the light most favorable to the Government,' afford 'deference to a jury's findings,' and draw 'all reasonable inferences in favor of the jury verdict.'" *United States v. Moyer*, 674 F.3d 192, 206 (3d Cir. 2012) (quoting *United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010)). As such, the defendant bears an "extremely high" burden. *United States v. Iglesias*, 535 F.3d 150, 155 (3d Cir. 2008) (internal quotation marks and citation omitted).

[8] 18 U.S.C. § 2421(a).

[9] App. 640; *see United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013).

At trial, Moreno testified that Zozaya hired women as prostitutes, scheduled them to work at a particular brothel house, and picked them up at the train or bus station to bring them to a brothel, or instructed one of his workers to do so. Moreno also testified that almost half of the women came from Queens, New York, which he knew because, "the first thing [the workers] do is we would always ask where [the women] had come from" when they picked women up for transport.[10] Guerrero and Pacheco also testified that Zozaya knew they lived out-of-state. On one occasion, Zozaya picked Guerrero up from a train station and brought her to a brothel. Moreover, the Government introduced into evidence numerous text messages between Zozaya's co-conspirator, Rojas, and various prostitutes, discussing scheduling and interstate travel plans.

Zozaya relies on *Twitchell v. United States* for the proposition that it is not a violation of § 2421 to cause a woman to transport herself across state lines where the defendant did not participate in the interstate travel.[11] But *Twitchell* is inapposite. Here, it is clear that Zozaya caused interstate travel for the purposes of prostitution by coordinating and prearranging the date and time on which women would travel interstate to work for him. And any intrastate travel he provided was not "separate" where he was

---

[10] App. 342-43.

[11] 330 F.2d 759, 759-60 (9th Cir. 1964). In *Twitchell*, the Ninth Circuit reversed defendant's conviction under § 2421 because the Government admitted defendant could not be "held to have counselled, commanded, or induced such transportation." *Id.* at 759 (internal quotation marks omitted). From this admission, the court determined that there was no evidence defendant participated in the actual interstate travel, although he latter participated in a trip that "was separate, and entirely intrastate." *Id.* at 760.

merely the second leg in an otherwise interstate trip taken for one purpose: to work as a prostitute in his brothels.[12]

Viewed in the light most favorable to the Government, the evidence permitted a rational jury to conclude that Zozaya conspired with others to cause the transportation of women across state lines to engage in prostitution.

## B. Jury instructions on harboring

Second, Zozaya argues that the District Court's jury instruction defining harboring constituted plain error. We disagree.[13]

A conviction for conspiracy to harbor illegal aliens under 8 U.S.C. § 1324(a)(1)(A)(iii) requires proof of conduct that tends "'substantially to facilitate an alien's remaining in the United States illegally and to prevent government authorities from detecting [the alien's] unlawful presence.'"[14]

In instructing the jury as to Count II, the District Court first gave the elements that constitute the crime of harboring an illegal alien. The elements relevant here are: "[s]econd, the defendant concealed, harbored or shielded from detection the alien, in violation of law;" and "fourth, that the defendant's actions in harboring, concealing or

---

[12] *Id.* at 760.

[13] Because this objection was unpreserved, we exercise plain error review over the District Court's jury instructions. Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 732 (1993). Reversal is only warranted if we conclude (1) an error was committed, (2) it was plain, and (3) it affected the outcome of the proceedings. *Id.* at 733-34.

[14] *United States v. Silveus*, 542 F.3d 993, 1003 (3d Cir. 2008) (quoting *United States v. Ozcelik*, 527 F.3d 88, 99 (3d Cir. 2008)).

shielding substantially facilitated the alien's ability to remain in the United States[.]"[15]

The District Court then went on to define and clarify the terms used in the elements of the crime. Specifically, the District Court instructed that:

> To 'harbor' means to simply give or afford shelter or refuge. To 'shield from detection' means to act in a way that prevents the authorities from learning of the fact that an alien is in the United States illegally.

> You need not find the defendant acted secretly or that the harboring of the alien was clandestine, as long as you find on the basis of all the evidence that the defendant harbored an illegal alien in a way that tended substantially to facilitate the alien remaining in the United States illegally or otherwise shielded the alien's illegal status or location from detection by authorities.[16]

Zozaya contends that these instructions were lacking because they did not require the Government "to prove beyond a reasonable doubt conduct that *both* (a) substantially facilitates an alien's remaining in the United States illegally *and* (b) prevents government authorities from detecting the alien's unlawful presence."[17]

Zozaya fails to account for the fact that when reviewing jury instructions, we "look at the instructions as a whole, not piecemeal."[18] Viewing the instructions all together, we find that there was no plain error. The District Court's instructions on both the concealment (element two) and substantial facilitation (element four) elements of harboring conform to our precedent.[19] Based on these instructions, the jury would have

---

[15] App. 647.
[16] App. 648.
[17] Zozaya Br. 28-29 (emphasis in original).
[18] *United States v. Greenspan*, 923 F.3d 138, 147 (3d Cir. 2019); *see Cupp v. Naughten,* 414 U.S. 141, 146-47 (1973) (stating the "well established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.").
[19] App. 648.

been aware that they needed to find both that Zozaya's conduct tended to substantially facilitate an alien's remaining in the United States, and prevent government detection.[20] In any case, even if there was plain error, Zozaya's substantial rights were not affected because, as discussed in greater detail below, there was sufficient evidence for the jury to conclude that Zozaya conspired to harbor aliens.

### C. Conspiracy to harbor aliens

Third, Zozaya argues that there was insufficient evidence for the jury to find that he conspired to harbor aliens. Specifically, he claims that the evidence was insufficient to show that he agreed to engage in conduct that would reduce the likelihood the Government would discover the illegal aliens he employed. We disagree.

Three former workers of Zozaya testified that Zozaya knew they were undocumented, and he paid them in cash without filing any tax paperwork. Moreno testified that Zozaya rented each brothel house in a different name, and

---

[20] *See United States v. George*, 779 F.3d 113, 118-20 (2d Cir. 2015) (finding that although the jury instruction stated that "harboring means simply to afford shelter to," and that the jury need not find that the defendant "acted secretly or that the harboring of the alien was clandestine," "when viewed as a whole," the instruction adequately conveyed the requisite concealment aspect of harboring where it instructed the jury that it must find defendant's actions "substantially facilitated the alien's ability to remain in the United States illegally" (internal quotation marks and alterations omitted)); *see also United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013) ("While the court stated that [h]arboring simply means to shelter, to afford shelter to, the entire charge taken as a whole conveyed to the jury that simply providing shelter was insufficient . . . the very next sentence properly instructed the jury that to find that [defendant] harbored [the alien], it must find based on the evidence in this case that the Government proved that the defendant . . . afforded shelter to [the alien] *in a way intended to substantially facilitate her remaining here illegally*." (internal quotation marks and citations removed, emphasis in original)).

9

Pacheco testified that she was not allowed to leave the brothel without permission, so as not to raise suspicion around the activity in the house. There was also testimony that Zozaya employed people as lookouts to "monitor" for police activity near the brothels.[21] The jury could infer from this evidence that Zozaya worked to "minimize[] the illegal employees' exposure to the general public" in order to avoid detection from law enforcement.[22] As such, the jury's verdict was not "so insupportable as to fall below the threshold of bare rationality."[23]

### D. Sentencing enhancement

Finally, Zozaya argues that there was insufficient evidence to support a six-level sentencing enhancement for harboring 25 to 99 illegal aliens.[24] We disagree.[25]

At sentencing, the District Court rejected Zozaya's objection, finding by a preponderance of the evidence that "there were over 25 illegal aliens harbored by the defendant."[26] The District Court's finding was supported by Special Agent Iatoro's testimony that law enforcement encountered "[a]pproximately 30" people on the day search warrants were executed on the brothels, and the Government proffered that all but

---

[21] App. 377.

[22] *United States v. McClellan*, 794 F.3d 743, 751 (7th Cir. 2015); *see also United States v. Chon*, 713 F.3d 812, 819 (5th Cir. 2013) (holding that renting hotel rooms and providing services for illegal aliens so that they could avoid leaving their rooms was "strong circumstantial evidence that [defendant] was aware of the scope and objectives of the conspiracy" to violate § 1324).

[23] *Coleman v. Johnson*, 566 U.S. 650, 656 (2012).

[24] U.S.S.G. § 2L1.1(b)(2)(B).

[25] We exercise plenary review over the District Court's interpretation and application of the Sentencing Guidelines and review its factual findings for clear error. *United States v. Cespedes*, 663 F.3d 685, 688 (3d Cir. 2011).

[26] App. 672-73.

two of those people were in the United States illegally.[27]  Zozaya has not claimed that the agent's testimony was unreliable, nor has he provided any evidence to rebut the number of aliens involved.  And as discussed, there was sufficient evidence for the jury to find that Zozaya conspired to harbor aliens, as opposed to them being "simply employed at the brothels."[28]

Accordingly, it was not clearly erroneous for the District Court to conclude that Zozaya's offense involved the harboring of 25 to 99 illegal aliens.

### III.    Conclusion

For the foregoing reasons, we will affirm the District Court's judgment.

---

[27] App. 201.

[28] Zozaya Br. 26.